UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JESSE P. SCHULTZ, III,<br>[ADDRESS REDACTED]<br><br>JOHN G. BAKER,<br>[ADDRESS REDACTED]<br><br>and<br><br>ALEXANDER STOKES CONTOMPASIS<br>a/k/a ALEX STOKES,<br>[ADDRESS REDACTED]<br><br>on behalf of themselves and those similarly<br>situated,<br><br>PLAINTIFFS<br>vs.<br><br>DISTRICT OF COLUMBIA,<br><br>PETER NEWSHAM,<br>Chief of Police, in his individual capacity,<br><br>LAMAR GREENE,<br>Assistant Chief of Police, in his individual<br>capacity,<br><br>ROBERT ALDER,<br>Assistant Chief of Police, in his individual<br>capacity,<br><br>JEFFERY CARROLL,<br>Commander, in his individual capacity,<br><br>KEITH DEVILLE,<br>Commander, in his individual capacity,<br><br>PAUL NIEPLING,<br>Lieutenant, in his individual capacity,<br><br>MICHAEL HOWDEN,<br>Officer, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

1

|  | ) |
| MELVIN WASHINGTON, | ) |
| Officer, in his individual capacity, | ) |
|  | ) |
| GREGORY ROCK, | ) |
| Officer, in his individual capacity, | ) |
|  | ) |
| DANIEL THAU, | ) |
| Office, in his individual capacity, | ) |
|  | ) |
| ANTHONY ALIOTO, | ) |
| Sergeant, in his individual capacity, | ) |
|  | ) |
| c/o Office of the Attorney General | ) |
| 441 4th St., NW | ) |
| Washington, DC 20001, | ) |
|  | ) |
| DEFENDANTS | ) |
|  | ) |
|  | ) |

**<u>COMPLAINT</u>**

<u>THE PARTIES</u>

1.      Plaintiffs JESSE P. SCHULTZ, III, JOHN G. BAKER, and ALEXANDER STOKES CONTOMPASIS a/k/a ALEX STOKES are individuals who were detained and arrested in a demonstration against Donald Trump on January 20, 2017.

2.      JESSE P. SCHULTZ, III is a 66 year old retired systems administrator who was living in the District of Columbia at the time of the demonstration. All charges against SCHULTZ were dismissed on February 8, 2017.

3.      JOHN G. BAKER is a 59 year old rideshare driver from Chicago. He attended the demonstration as a street medic. All charges against BAKER were dismissed on February 8, 2017.

2

4.     ALEXANDER STOKES CONTOMPASIS is a journalist who was covering the demonstration. At the time, CONTOMPASIS hosted an Albany Public Access TV news show. All charges against CONTOMPASIS were dismissed on February 21, 2017.

5.     SCHULTZ and BAKER are hereinafter collectively referred to as "named False Arrest Plaintiffs."

6.     SCHULTZ, BAKER, and CONTOMPASIS are hereinafter collectively referred to as "named Plaintiffs."

7.     Named Plaintiffs bring this suit on behalf of themselves and those similarly situated.

8.     Defendant PETER NEWSHAM is the Chief of Police of the Metropolitan Police Department (MPD). At all times relevant to this Complaint, Defendant NEWSHAM was the Interim Chief of Police of MPD and was acting under color of District law within the scope of his employment with the DISTRICT OF COLUMBIA. Defendant NEWSHAM is sued in his individual capacity.

9.     Defendants LAMAR GREENE, ROBERT ALDER, JEFFREY CARROLL, KEITH DEVILLE, PAUL NIEPLING, and ANTHONY ALIOTO are all sworn officers of MPD who supervised, directed, or ordered the conduct of other MPD officers described below. At all times relevant to this Complaint, Defendants GREENE, ALDER, CARROLL, DEVILLE, NIEPLING, and ALIOTO were acting under color of District law within the scope of their employment with the DISTRICT OF COLUMBIA. These defendants are sued in their individual capacities.

10.     Defendants MICHAEL HOWDEN, MELVIN WASHINGTON, GREGORY ROCK, and DANIEL THAU are all sworn officers of MPD. At all times relevant to this Complaint, Defendants HOWDEN, WASHINGTON, ROCK, and THAU

were acting under color of District law within the scope of their employment with the

DISTRICT OF COLUMBIA. These defendants are sued in their individual capacities.

## JURISDICTION AND VENUE

11.     This action arises under 42 U.S.C. § 1983.

12.      This Court has jurisdiction over the parties and subject matter pursuant to

28 U.S.C. § 1331 and § 1367(a).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because

the events or omissions giving rise to this action occurred in the District of Columbia.

## STATEMENT OF FACTS

*The march*

14.     On January 20, 2017, Donald John Trump was sworn in as the forty-fifth

president of the United States.

15.     The circumstances of President Trump's election, his policy positions, and

his outrageous comments during the election have provoked widespread criticism.

16.     Americans from all walks of life came to Washington, D.C. to voice their

opposition to the extremist agenda of the incoming president.

17.     The overwhelming majority of demonstrators in Washington, D.C. on

January 20, 2017 were peaceful and law-abiding.

18.     Between 10 a.m. and 11 a.m., hundreds of demonstrators walked south on

13th St., NW, from Logan Circle towards the National Mall.

19.     The number of demonstrators walking down 13th St., NW was sufficiently

large that they took up two or three blocks.

20.     Named False Arrest Plaintiffs and all members of the False Arrest Class were among those in the crowd walking from Logan Circle towards the National Mall.

21.     When demonstrators began to march down 13th St., NW from Logan Circle, MPD had approximately 100 officers present, including Defendant DEVILLE, along with approximately 10 police vans and five or six additional police vehicles.

22.     DEVILLE was the on-scene commander who directed the MPD officers on the ground as they responded to the march.

23.     DEVILLE was the commander responsible for civil disturbance planning and deployment during the inauguration.

24.     DEVILLE responded to Logan Circle just before 10:00 in the morning.

25.     DEVILLE received orders from top MPD officials in MPD's command center.

26.     Among the officials directing DEVILLE from the command center was LAMAR GREENE.

27.     Defendant NEWSHAM has acknowledged that he was stationed in the command center on January 20.

28.     On information and belief, NEWSHAM himself was overseeing and directing the actions of GREENE, DEVILLE, and other top MPD officials as they, in turn, directed MPD's actions regarding the demonstrators who marched down 13th Street NW between 10 a.m. and 11 a.m. on January 20.

29.     MPD officers witnessed acts of vandalism on and around 13th St., NW and made DEVILLE, GREENE, and (on information and belief) NEWSHAM aware of these acts.

30.     DEVILLE, under the direction of NEWSHAM and GREENE, did not order MPD officers to identify or apprehend individuals committing acts of vandalism.

31.     Instead, approximately 15 minutes after demonstrators began to march south down 13th St., NW, and after a few acts of vandalism had been committed by a few people, DEVILLE declared to MPD officers that the march was a "riot" and ordered MPD officers to stop the marchers from continuing further south.

32.     DEVILLE received the order to stop the march from GREENE at the command center, where (on information and belief) he received direction from NEWSHAM.

33.     DEVILLE knew that not all of the individuals who were marching were committing acts of vandalism when he declared the march a "riot." He was also aware that some of the individuals walking down 13th St., NW were journalists photographing the march or otherwise documenting the march.

34.     Neither when DEVILLE declared a "riot" nor at any time for the rest of the day, did DEVILLE or his supervisors — from NEWSHAM and GREENE to the officers on the ground — distinguish or attempt to distinguish between individuals who were peacefully exercising their First Amendment rights and individuals who were committing unlawful acts.

35.     A number of MPD officers had ready access to bullhorns and to loudspeakers on their vehicles.

36.     Nonetheless, at no time did NEWSHAM, GREENE, DEVILLE, or any other MPD official order that demonstrators be given a dispersal order, be given an

opportunity to disperse, or be given a safe route to disperse. No order to disperse, opportunity to disperse, or safe route to disperse was ever provided.

37.    Using pepper spray, flash-bang grenades, concussion grenades, stingers, smoke flares, and LRADs, MPD officers chased many of the demonstrators back towards Franklin Square.

38.    Throughout the demonstrators' chaotic flight from the police, some demonstrators left the Franklin Square area, while other individuals were still arriving to demonstrate.

39.    DEVILLE, under the direction of NEWSHAM and GREENE, ordered MPD officers to block numerous alternative egress routes in order to force named False Arrest Plaintiffs and members of the False Arrest Class to flee north up 14th St., NW and then east on L St., NW to the corner of 12th and L St., NW. Defendants NEWSHAM, GREENE, and DEVILLE thus caused MPD officers to act in a coordinated manner to funnel individuals to that location.

40.    DEVILLE, under the direction of NEWSHAM and GREENE, ordered MPD officers to establish a blockade at the corner of 12th and L St., NW to trap individuals proceeding running east on L St., NW.

41.    By establishing this blockade, Defendants left named False Arrest Plaintiffs and members of the False Arrest Class with nowhere to go but into the cordoned area.

42.    Defendants MICHAEL HOWDEN, GREGORY ROCK, DANIEL THAU, and MELVIN WASHINGTON were among the MPD officers who established the blockade.

43.     Defendant ANTHONY ALIOTO was among the MPD officers who supervised the establishment of the blockade.

44.     Although some individuals on L St., NW managed to escape by evading the MPD blockade before it closed in, named False Arrest Plaintiffs and members of the False Arrest Class were detained by police at the northwest corner of 12th and L St., NW and on L St., NW itself.

45.     Named False Arrest Plaintiffs did not try to run away.

46.     SCHULTZ wanted to leave but the blockade closed in around him too quickly.

*The kettle and arrests*

47.     MPD officers detained more than 200 individuals in the cordoned area (the "kettle") they had created at 12th and L St., NW.

48.     Neither the MPD officials who ordered the creation of the kettle – including Defendants NEWSHAM, GREENE, and DEVILLE – nor the MPD officers who established the kettle – including HOWDEN, ROCK, THAU, ALIOTO, and WASHINGTON – took any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be detained in the kettle.

49.     NEWSHAM (on information and belief), GREENE, and DEVILLE were aware that the size of the march had fluctuated dramatically since demonstrators left Logan Circle, and they were aware that numerous demonstrators had joined or left the march throughout its disorganized progress until the point at which a number of demonstrators were forced into the kettle and prevented from leaving. NEWSHAM,

GREENE, DEVILLE, and the officers involved in forming the kettle had no ability to identify which, if any, of the kettled individuals had committed crimes. NEWSHAM, GREENE, and DEVILLE knew that neither they nor their officers had the ability to identify which, if any, of the kettled individuals had committed crimes.

50.     As DEVILLE subsequently testified regarding the decision to detain demonstrators, "I wasn't differentiating who was demonstrating and who was rioting."

51.     Defendant NEWSHAM later acknowledged to *The Washington Post* that his officers strategically maneuvered the demonstrators to trap them in the kettle. The MPD official in charge at the scene, DEVILLE, was in constant contact with the MPD command center, where Defendant NEWSHAM was stationed throughout the day. On information and belief, NEWSHAM ordered or approved trapping demonstrators in the kettle at the time this action took place, and/or approved the continued detention and arrest of the kettled demonstrators despite his awareness that the police had no ability to identify which, if any, of these individuals had committed crimes.

52.     Because of Defendants' intentional and coordinated action in chasing individuals north on 14th St., NW, then east on L St., NW, while driving them on by using pepper spray, flash-bang grenades, concussion grenades, and stingers, and blocking their egress via alternative routes, the individuals who were trapped in the kettle at 12th and L St., NW were not there by virtue of having acted unlawfully but merely because they were present on particular downtown D.C. streets on the morning of January 20 and then tried to flee when police chased and assaulted them.

53.     Named False Arrest Plaintiffs and members of the False Arrest Class did not engage in any vandalism or other unlawful activity on the streets of Washington, D.C. on January 20, 2017.

54.     Named False Arrest Plaintiffs and members of the False Arrest Class did not encourage anyone to engage in acts of vandalism and did not cheer for anyone who engaged in acts of vandalism.

55.     The kettle of detainees at 12th and L St., NW was formed at about 10:45 a.m.

56.     Named False Arrest Plaintiffs were detained there along with the other members of the False Arrest Class.

57.     Defendant DEVILLE, under the direction of NEWSHAM and GREENE, declared that all detainees were under arrest and ordered that no one was to leave the kettle. HOWDEN and ALIOTO were among those primarily responsible for ensuring that the detainees could not leave.

58.     Defendants ROBERT ALDER, JEFFERY CARROLL, and PAUL NIEPLING supervised the continued maintenance of the kettle. These officials continued to communicate with and receive orders from the MPD command center, where Defendant NEWSHAM was overseeing the operation.

59.     Defendant GREENE ordered the formal arrests of named False Arrest Plaintiffs and members of the False Arrest Class. Various MPD officers took named False Arrest Plaintiffs and members of the False Arrest Class into formal custody.

60.     Neither the officials in charge of the kettle and/or arrests – Defendants NEWSHAM, GREENE, ALDER, CARROLL, DEVILLE, and NIEPLING– nor any of

the arresting officers took any actions ensure that only individuals whom they had probable cause to believe had committed crimes would be handcuffed and transported to detention facilities.

61.    The actions of the defendants described above were taken pursuant to a municipal policy, practice and custom of responding to demonstrations at which some lawbreaking occurs by unlawfully detaining and/or arresting participants who they have no reason to believe have broken any law.

62.    NEWSHAM spent the day on January 20 in an MPD command center, where he was well aware of and (on information and belief) directed the massive and coordinated MPD response to the march down 13th St., NW, pursuant to MPD Standard Operating Procedure 16-01 ("Handling First Amendment Assemblies and Mass Demonstrations"), which provides (at page 11) that "[d]uring periods in which the Department is fully mobilized for mass demonstration operations . . . [t]he Chief of Police, as the commanding official of the MPD, shall oversee all police activities . . . ."

63.    DEVILLE, the officer in command on the scene of the demonstration and subsequent kettling, was in constant communication with the MPD command center, where he received orders from GREENE and other top-ranking members of MPD. On information and belief, GREENE and the other officials who instructed DEVILLE acted on the orders or with the approval of NEWSHAM, who was with them in the command center.

64.    To whatever extent NEWSHAM did not direct the coordinated MPD response himself, he nonetheless was aware of the large-scale MPD actions taken against the individuals who marched down 13th St., NW, and he deliberately failed to supervise

and restrain Defendants GREENE and DEVILLE, and other officers under his command, from violating the rights of named False Arrest Plaintiffs, members of the False Arrest Class, and others, repeatedly and continually throughout January 20.

*The crowd did not act as a unit*

65.     Between 10 a.m. and 11 a.m. on January 20, some demonstrators engaged in acts of vandalism on or near 13th St., NW, between Logan Circle and Franklin Square.

66.     The individuals who engaged in vandalism were dressed in all-black clothing and had masks over their faces. These individuals are not part of the False Arrest Class. Named False Arrest Plaintiffs were not dressed in all-black clothing and did not have masks over their faces.

67.     The crowd did not act uniformly in response to these acts of vandalism. Some individuals in the crowd attempted to leave the demonstration to distance themselves from these acts of vandalism. Some individuals who were part of the march were unaware that acts of vandalism had occurred and therefore did not have any reaction to the acts of vandalism. Some individuals in the crowd were clearly marked legal observers and clearly identifiable journalists whose reaction was merely to watch what was occurring. Some individuals in the crowd appeared calm and restrained. Far from cheering the acts of vandalism, some individuals in the crowd shouted that the protest should remain peaceful. Some individuals in the crowd were chanting while others were not. DEVILLE observed some individuals "stop and step out of the way," according to his trial testimony.

68.     Further, no reasonable police officer could have inferred that the crowd acted as a unit based on how they were dressed. While the individuals who committed acts of vandalism wore all-black with masks covering their faces, named False Arrest Plaintiffs and members of the False Arrest Class did not fit this description. Named False Arrest Plaintiffs and the members of the False Arrest Class were not wearing masks over their faces and did not engage in any acts of vandalism. For example, SCHULTZ was wearing a blue raincoat and a blue hoodie. BAKER was wearing khaki pants, a fishing vest with a dark green down jacket, and a tan cap.

69.     Some members of the crowd had distinctive attire that distinguished them from others in the crowd. For example there were legal observers wearing neon green hats with the words "LEGAL OBSERVER" clearly marked; journalists carrying cameras and/or press credentials; and medics wearing "red cross" symbols.

70.     Still further, many people who could not be tied to any illegal activity streamed in and out of the crowd before the kettling and mass arrests took place. Throughout the time that the demonstrators were moving south on 13th St., NW, both before and after acts of vandalism occurred, some individuals joined the march and others left it. There was a diverse flow of human traffic entering and exiting the area.

71.     According to the trial testimony of DEVILLE, at one point "[q]uite a few people" left the group and at another point, eight to 15 people "completely br[oke] away and start[ed] running in the opposite direction." In fact, at various times both before and after the acts of vandalism occurred, many people did leave the group, large portions of the crowd did break away, and individuals in the crowd did move in divergent directions.

72.     While many individuals exited, other joined the group, both before and after the acts of vandalism occurred.

73.     As he conceded in trial testimony, DEVILLE he could not be sure that everyone that was at 12th and L St., NW was also at Logan Circle. In fact, not everyone who was at 12th and L St., NW was also at Logan Circle.

74.     DEVILLE further testified that on I St., NW, "people were coming into the group." In fact, people did join the group along I St., NW, as well as at other points both before and after the vandalism occurred.

75.     DEVILLE conceded during his testimony that individuals from the sidewalk may have joined the group marching down the street. In fact, individuals from the sidewalk did join the group marching down the street.

76.     According to the trial testimony of DEVILLE, after the remaining portion of the crowd entered Franklin Park, they "regrouped" into a "larger" body. In fact, the crowd did fluctuate in size throughout the march, becoming much smaller at times and larger at other times.

77.     After all of the vandalism had stopped, but before the kettling, "[t]here were still people leaving," according to DEVILLE's trial testimony. In fact, people continued to join and leave the crowd after all the vandalism had stopped.

78.     According to DEVILLE's trial testimony, by the time the crowd reached the ultimate arrest location, the crowd had "broken apart and re-formed a couple of times" and observed that the group had "evolved[.]" In fact, the crowd was not a single cohesive unit, but did break apart at various time and its composition changed throughout the march.

79.     DEVILLE also distinguished in his testimony between the general crowd and a "core group" which was further east. According to DEVILLE, there was a "core group that was together and they were committing the damage and/or cheering the damage on and/or celebrating and then reabsorbing those that were doing the violent acts," but there were also "a lot of people that were caught up in watching it." These people who were "caught up in watching it" included individuals "running around with cameras[.]" In fact, a lot of people were caught up in the crowd who were simply watching, including journalists with cameras. Nevertheless, individuals not part of the protest, such as journalists covering the protest, were kettled and arrested.

80.     Additionally, the detention and arrests were not limited to individuals in what DEVILLE described as the "core group," but included those who were marching and not rioting.

81.     DEVILLE conceded that while he believed "there was a large group of individuals rioting on I Street," he "couldn't testify that – every single person" was rioting." In fact, not everyone on I St., NW was rioting. Nevertheless, DEVILLE attempted to detain and arrest every single person.

82.     Although none of the defendants could reasonably have believed that the crowd was acting unlawfully as a unit, no dispersal order was given to distinguish the wholly innocent from the others.

83.     In fact, the defendants made no effort whatsoever to discern whether individuals were or were not part of a group acting as a unit. Rather, they indiscriminately kettled and arrested individuals regardless of whether the individuals were even part of the march at the time of the acts of vandalism.

84.     DEVILLE conceded during testimony that in deciding to detain demonstrators, he "wasn't differentiating who was demonstrating and who was rioting." In fact, DEVILLE did not differentiate who was demonstrating and who was rioting.

85.     Indeed, the defendants knew, but disregarded the fact that not everyone they were arresting was part of the crowd at the time the acts of vandalism occurred.

86.     According to HOWDEN's trial testimony, the individuals who were "break[ing] things" were "all of (sic) dressed very, very similarly, all black, face masks, goggles[.]" After committing an act of vandalism, these individuals "would run off, disappear into the crowd" of individuals who were "all dressed in dark clothing, faces covered, eye covering (sic)." In fact, all of the individuals who engaged in acts of vandalism were dressed in all-black and wore face masks, and many wore goggles.

87.     However, the "crowd" into which the vandals disappeared was not the same crowd that was kettled and arrested. Rather the crowd that was kettled and arrested included many individuals who were not "dressed in dark clothing, faces covered, eye covering (sic)." Indeed, none of the members of the False Arrest Class were part of the crowd of individuals into which the vandals disappeared.

*DEVILLE's hostility to the marchers' ideology*

88.     According to his trial testimony on November 29, 2017, DEVILLE believed "the group gathering at Logan Circle was going to be problematic" because they were "anarchist or anarchist ideology and anti-capitalist." He further testified that he did not want the group to reach New York and 11th St., NW, because it was "the footprint of capitalism" and the stores there were "high-end[.]" He asked at one point whether the

group was "an anarchist-type or just protest?" implying that "anarchist-type" groups do

not have an equal right to engage in protests.

*Municipal and supervisory liability*

89.    The coordinated MPD response is part of a custom of the DISTRICT OF

COLUMBIA of responding with mass detentions and/or arrests to non-violent

demonstrators at largely peaceful demonstrations where some law-breaking is occurring.

90.    For instance, MPD has:

a)   Unconstitutionally detained demonstrators during the counter-

inaugural demonstrations in Adams Morgan in January 2005; the

arrest of numerous peaceful demonstrators led to lawsuits resolved by

large settlement payments to victims of the MPD's actions

b)   Unconstitutionally detained demonstrators during the World Bank

protests in Pershing Park in September 2002; the mass arrests of

protestors led to lawsuits resolved by large settlement payments to

victims of the MPD's actions

c)   Unconstitutionally detained anti-globalization demonstrators in April

2000, including kettling and denying detainees of access to food and

water, all of which led to lawsuits resolved by large settlement

payments to victims of MPD's actions

91.    The prior incidents in which MPD unconstitutionally detained peaceful

demonstrators where some law-breaking occurred made clear to the DISTRICT OF

COLUMBIA that its officers required training regarding the constitutional limits of their

authority to detain demonstrators. To whatever extent the individual Defendants' actions described here did not reflect municipal custom or carry out affirmative instructions from NEWSHAM, these actions were the result of the District's failure to train MPD officers.

92.    When asked to comment on the conduct of MPD officers on January 20, NEWSHAM responded in an interview with WTOP radio by stating: "[A]ll the police officers were outstanding in the judgment that they used. They used the least amount of force necessary to bring those folks safely and respectfully into custody. I couldn't be more proud of the way this department responded." NEWSHAM further stated to WTOP that he was "very, very pleased" with the way police responded to the demonstration. NEWSHAM accordingly ratified the officers' conduct.

93.    At a televised news conference on January 20, 2017, NEWSHAM stated, "I've been very pleased with MPD's response to these events. Our officers have showed and continue to show excellent judgment." Later in the conference he reiterated that the police "used excellent judgment in their decisions." NEWSHAM accordingly ratified the officers' conduct.

94.    On Sunday January 22, 2017, NEWSHAM stated, "I don't know exactly right now where we could have been better," according to *The Washington Post*. NEWSHAM accordingly ratified the officers' conduct.

95.    Following a report by the Office of Police Complaints raising concerns about MPD's conduct on Inauguration Day, an official MPD spokesperson reaffirmed that its officers' actions conformed to the DISTRICT OF COLUMBIA's expectations: "The Metropolitan Police Department stands by its assertion that our officers acted responsibly and professionally during Inauguration Day," MPD spokesperson Rachel

18

Reid said in a statement emailed to the news media. This official communication from an

MPD spokesperson on behalf of MPD constitutes a ratification of the officers' conduct

by the DISTRICT OF COLUMBIA.

*Conditions of Confinement*

96.     CONTOMPASIS and members of the Conditions of Confinement Class

were detained in the kettle as a result of the same interactions described above with

respect to the named False Arrest Plaintiffs and members of the False Arrest Class.

97.     During the many hours that CONTOMPASIS and members of the

Conditions of Confinement Class were detained in the kettle, MPD officers, under the

supervision and direction of NEWSHAM, ALDER, CARROLL, and NIEPLING, failed

to provide them with food, water, or access to a toilet.

98.     Many demonstrators specifically requested food, water, and/or access to a

toilet.

99.     While the detainees were kettled, several MPD officers threw edible food

in a garbage can in view of the detainees in order to taunt them. One detainee specifically

asked the officers for the food that they were throwing away, and they refused to provide

it. The officers laughed at the detainee as they threw their food away.

100.    Hungry, some of the detainees resorted to rummaging in a city trashcan

for the food the officers had discarded.

101.    One MPD officer made clear to the detainees that no toilets would be

made available by stating in response to one detainee's request that she should "shit [her]

pants" to prove she needed a toilet

102.    Having no other place to urinate, some of the demonstrators urinated on the street or against the side of buildings. Some demonstrators rummaged in the trash for empty bottles in which to urinate. One demonstrator crouched against the side of a building and defecated into a paper bag.

103.    One officer taunted a detainee, saying "If you wanted to go to the bathroom, you shouldn't have gotten arrested."

104.    Within 30 to 45 minutes of the formation of the kettle, by 11:30 a.m., MPD had prisoner vans and processing officers at the scene and was ready for the processing of detainees.

105.    Nonetheless, the handcuffing of detainees and placing them into vehicles for transport to detention facilities stretched on for hours, with some of the detainees remaining at the corner of 12th and L St., NW until the late afternoon and others remaining until after sunset.

106.    The gap in time between the point at which MPD was prepared to take detainees into formal custody and the point at which the detainees were actually processed reflects that MPD officers, under the supervision and direction of NEWSHAM, ALDER, CARROLL, and NIEPLING purposefully conducted the arrest process unnecessarily slowly in order to maximize the detainees' discomfort.

107.    CONTOMPASIS was detained in the kettle for nine hours.

108.    By the time CONTOMPASIS was formally arrested and transported to a detention facility, he had gone approximately 11 hours without access to a toilet.

109.    Other members of the Conditions of Confinement Class went at least 4 hours without access to bathroom facilities.

20

110.    CONTOMPASIS was not given food or drink until later in the evening; he was detained an approximate total of 12 hours without being provided food or drink.

111.    Other members of the Conditions of Confinement Class were detained for at least 4 hours without being provided food or drink.

112.    As a result of the denial of food, water, and access to a toilet, CONTOMPASIS and members of the Conditions of Confinement Class experienced hunger, thirst, discomfort, and anxiety.

*Notice of claim*

113.    Named Plaintiffs and members of the False Arrest Class and Conditions of Confinement Class have given timely notice in writing to the Mayor of the District of Columbia of the "approximate time, place, cause, and circumstances" of their injuries, pursuant to D.C. Code § 12-309. Their Notice of Claim letter was hand-delivered to the D.C. Office of Risk Management on July 20, 2017.

*Class action allegations – False Arrest Class*

114.    Named False Arrest Plaintiffs bring this case on behalf of themselves and under Rules 23(a), 23(b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the False Arrest Class.

115.    The False Arrest Class consists of all individuals who were detained and/or arrested on January 20, 2017 in the vicinity of 12th and L Str., NW, with the exception of (1) individuals who engaged in property destruction or assaultive behavior; (2) individuals wearing a hood or mask to conceal their identity; (3) individuals who have

pled guilty to an offense arising out of the events described in this Complaint; (4) individuals who have filed a separate civil lawsuit; (5) individuals who have been finally adjudicated as guilty of a crime arising out of the events described in this Complaint.

116.    Certification of this Class under Federal Rule of Civil Procedure 23(b)(1) is appropriate because prosecuting the actions separately would create a risk of inconsistent verdicts establishing incompatible standards of conduct for police officers with respect to a single incident.

117.    Certification of a Class under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims as detailed below.

118.    The False Arrest Class is entitled to monetary relief.

119.    Among the questions of law and fact common to the False Arrest Class are:

       a)  whether the crowd operated as a cohesive unit;

       b)  whether a dispersal order was necessary;

       c)  whether an audible dispersal order was given;

       d)  whether the defendants distinguished or attempted to distinguish between individuals who were peacefully exercising their First Amendment rights and individuals who were committing unlawful acts;

       e)  whether a reasonable police officer could believe that everyone present had committed a crime;

f)   whether law enforcement officers may legally arrest an

undifferentiated group of protesters without either individualized

probable cause or probable cause to believe that the group as a whole

acted as a unit;

g)   whether the right to be free from arrest without individualized

probable cause was clearly established as of January 20, 2017

h)   whether the DISTRICT OF COLUMBIA maintains a municipal

policy, practice and custom of responding to demonstrations at which

some lawbreaking occurs by unlawfully detaining and/or arresting

participants who they have no reason to believe have broken any law

i)   whether the District, through its final decisionmaker NEWSHAM,

ratified the conduct of the officers involved in the arrest of named

False Arrest Plaintiffs and members of the False Arrest Class

120.   The proposed False Arrest Class is so numerous that joinder of all

members is impracticable.  The exact number of class members is unknown at this time

but is estimated to be approximately 200 people.

121.   Named False Arrest Plaintiffs have claims that are typical of the claims of

the other members of the False Arrest Class, because named False Arrest Plaintiffs and

all other members of the False Arrest Class were injured by exactly the same means, that

is, by the same unconstitutional arrest.

122.   Named False Arrest Plaintiffs will fairly and adequately protect the

interests of the members of the False Arrest Class and have retained counsel who is

competent and experienced in complex federal civil rights litigation.

123.     Named False Arrest Plaintiffs have no interests that are contrary to or in conflict with those of the False Arrest Class.

*Class action allegations – Conditions of Confinement Class*

124.     CONTOMPASIS brings this case on behalf of himself and under Rules 23(a), 23(b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Conditions of Confinement Class.

125.     The Conditions of Confinement Class consists of all individuals who (1) were detained and/or arrested on January 20, 2017 in the vicinity of 12th and L St., NW; (2) did not have access to food, water, and/or bathroom facilities within 4 hours of the time the detention began; NW; and (3) have not filed a separate civil lawsuit relating to the conditions of their confinement.

126.     Certification of this Class under Federal Rule of Civil Procedure 23(b)(1) is appropriate because prosecuting the actions separately would create a risk of inconsistent verdicts establishing incompatible standards of conduct for police officers with respect to a single incident.

127.     Certification of a Class under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims as detailed below.

128.     The Conditions of Confinement Class is entitled to monetary relief.

129.     Among the questions of law and fact common to the Conditions of Confinement Class are:

a)  how long the police could permissibly keep the members of the

Conditions of Confinement Class in custody without access to food,

water, and/or bathroom facilities;

b)  whether the right of access to food, water, and/or bathroom facilities

without unreasonable delay was clearly established as of January 20,

2017;

c)  whether the police were permitted to significantly delay the formal

arrest, processing, and eventual release of members of the Conditions

of Confinement Class without a legitimate law enforcement reason;

d)  whether there was a legitimate law enforcement reason for the

significant delay in the formal arrest, transport, processing, and

eventual release of members of the Conditions of Confinement Class

e)  whether the DISTRICT OF COLUMBIA, through its final

decisionmaker NEWSHAM, ratified the conduct of the officers

involved in the detention and arrest of Conditions of Confinement

Class

f)  whether the right to be free from a significant and unnecessary delay in

formal arrest, transport, processing, and eventual release was clearly

established as of January 20, 2017

130.    The proposed Class is so numerous that joinder of all members is

impracticable.  The exact number of class members is unknown at this time but is

estimated to be approximately 200 people.

131.    CONTOMPASIS has a claim that is typical of the claims of the other members of the Conditions of Confinement Class, because CONTOMPASIS and all other members of the Conditions of Confinement Class were injured by exactly the same means, that is, by prolonged detention without access to food, water, or bathroom facilities and a significant delay in formal arrest, transport, processing, and eventual release without a legitimate law enforcement purpose.

132.    CONTOMPASIS will fairly and adequately protect the interests of the members of the Conditions of Confinement Class and has retained counsel who is competent and experienced in complex federal civil rights litigation.

133.    CONTOMPASIS has no interests that are contrary to or in conflict with those of the Conditions of Confinement Class.

<u>COUNT I:</u>
<u>VIOLATION OF THE FOURTH AMENDMENT (FALSE ARREST) PURSUANT TO
42 U.S.C. § 1983
(ALL NAMED FALSE ARREST PLAINTIFFS AND THE FALSE ARREST CLASS
AGAINST ALL DEFENDANTS)</u>

134.    The individually named defendants have violated the Fourth Amendment by detaining and arresting, directing the detainment and arrest, or causing the detainment and arrest of named False Arrest Plaintiffs and members of the False Arrest Class without probable cause.

135.    The DISTRICT OF COLUMBIA has violated the Fourth Amendment by maintaining a municipal policy, practice and custom of responding to demonstrations at which some lawbreaking occurs by unlawfully detaining and/or arresting participants who they have no reason to believe have broken any law.

136.     The DISTRICT OF COLUMBIA has violated the Fourth Amendment by ratifying, through its final decisionmaker NEWSHAM, the unlawful detention and arrest of Plaintiffs and members of the False Arrest Class.


COUNT II:
COMMON LAW FALSE ARREST
(ALL NAMED FALSE ARREST PLAINTIFFS AND THE FALSE ARREST CLASS
AGAINST ALL DEFENDANTS)

137.     The individually named defendants have committed the common law tort of false arrest by detaining and arresting, directing the detainment and arrest, or causing the detainment and arrest of named False Arrest Plaintiffs and members of the False Arrest Class without probable cause.

138.     To the extent that the arrests of named False Arrest Plaintiffs and members of the False Arrest Class were based in part on the fact that some of the individuals in the crowd were wearing all-black, the arrests were unlawful under District law because they constitute a restriction regarding a First Amendment assembly based on "factors such as the attire or appearance of persons participating or expected to participate in an assembly[.]" D.C. Code § 5-331.04(c).

139.     The arrests of named False Arrest Plaintiffs and members of the False Arrest Class are unlawful under District law because although it was "reasonably possible" to seek "to enforce the restrictions by issuing citations to, or by arresting, the specific non-compliant persons, where probable cause to issue a citation or to arrest is present," D.C. Code § 5-331.04(b)(1), the individually named defendants never did so and instead arrested the entire crowd indiscriminately.

27

140.    The arrests of named False Arrest Plaintiffs and members of the False Arrest Class are unlawful under District law because although it would have been "reasonably possible" for the individually named defendants to respond to disorderly conduct "by dispersing, controlling, or arresting the persons engaging in such conduct," D.C. Code § 5-331.04(c) they did not do so and instead arrested the entire crowd indiscriminately.

141.    The arrests of named False Arrest Plaintiffs and members of the False Arrest Class are unlawful under District law because the individually named defendants did not provide "at least one clearly audible and understandable order to disperse using an amplification system or device," and did not "provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal." D.C. Code § 5-331.04(c).

142.    The actions of NEWSHAM , DEVILLE, and GREENE, namely ordering the kettling or encircling of named False Arrest Plaintiffs and the False Arrest Class and detaining them in the kettle for several hours, violated the rights of named False Arrest Plaintiffs and the False Arrest Class under the First Amendment Assemblies Act because Defendants lacked "probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts" and because the police did not "have the ability to identify those individuals." D.C. Code § 5-331.08.

143.    The DISTRICT OF COLUMBIA is liable for the acts of the individually named defendants and/or other MPD officers under a theory of *respondeat superior*.

COUNT III:
NEGLIGENCE *PER SE* / VIOLATION OF THE FIRST AMENDMENT ASSEMBLIES
ACT (ARREST-RELATED VIOLATIONS)
(ALL NAMED FALSE ARREST PLAINTIFFS AND THE FALSE ARREST CLASS
AGAINST ALL DEFENDANTS)

144.    To the extent that the violations of the First Amendment Assemblies Act

described in Count II were not intentional, they were negligent and constitute negligence

*per se*.

145.    The DISTRICT OF COLUMBIA is liable for the acts of the individually

named defendants and/or other MPD officers under a theory of *respondeat superior*.

COUNT IV:
VIOLATION OF THE FIRST AMENDMENT PURSUANT TO 42 U.S.C. § 1983
(ALL NAMED FALSE ARREST PLAINTIFFS AND THE FALSE ARREST CLASS
AGAINST DEFENDANT DEVILLE)

146.    DEVILLE violated the First Amendment rights of named False Arrest

Plaintiffs and the False Arrest Class because he targeted these individuals for arrest,

without probable cause, based on their actual or perceived "anarchist" or "anti-capitalist"

ideology or their association with such individuals.

COUNT V:
VIOLATION OF THE FOURTH AND FIFTH AMENDMENTS (CONDITIONS OF
CONFINEMENT) PURSUANT TO 42 U.S.C. § 1983
(PLAINTIFF CONTOMPASIS AND THE CONDITIONS OF CONFINEMENT CLASS
AGAINST DEFENDANTS NEWSHAM, ALDER, CARROLL, NIEPLING, AND THE
DISTRICT OF COLUMBIA)

147.    The actions of NEWSHAM, ALDER, CARROLL, and NIEPLING in

ordering or approving the detention of CONTOMPASIS and members of the Conditions

of Confinement Class for a prolonged period without access to food, water, or bathroom

facilities violated the Fourth Amendment right to be free from unreasonable searches and

seizures, or in the alternative, the Fifth Amendment right to due process of law.

148.    The DISTRICT OF COLUMBIA has violated the Fourth Amendment, or

alternatively the Fifth Amendment, by ratifying, through its final decisionmaker

NEWSHAM, the unconstitutional conditions of confinement.

COUNT VI:
NEGLIGENCE *PER SE* / VIOLATION OF THE FIRST AMENDMENT ASSEMBLEIS
ACT (CONDITIONS-RELATED VIOLATIONS)
(PLAINTIFF CONTOMPASIS AND THE CONDITIONS OF CONFINEMENT CLASS
AGAINST DEFENDANTS NEWSHAM, ALDER, CARROLL, NIEPLING, AND THE
DISTRICT OF COLUMBIA)

149.    The actions of NEWSHAM, ALDER, CARROLL, and NIEPLING,

namely the failure to provide food to detainees "not released within a reasonable time of

arrest," violated the rights of Plaintiff CONTOMPASIS and the Conditions of

Confinement Class.

150.    The DISTRICT OF COLUMBIA is liable for the acts of the individually

named defendants and/or other MPD officers under a theory of *respondeat superior*.

JURY TRIAL DEMANDED

Plaintiffs demand a jury on all issues which may be properly tried by jury.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:


(1) Declare Defendants' conduct to be unlawful;

(2) Order the expungement of any and all records of the arrests of named False Arrest
Plaintiffs and members of the False Arrest Class;

(3) Award named Plaintiffs and members of the False Arrest Class and Conditions of
Confinement Class compensatory and punitive damages in an amount to be
determined at trial;

(4) Grant named Plaintiffs and members of the False Arrest Class and Conditions of
Confinement Class an award of attorney fees and other litigation costs reasonably
incurred in this action;

(5) Grant named Plaintiffs and members of the False Arrest Class and Conditions of
Confinement Class such other and further relief which the Court deems proper.

Respectfully Submitted,

 _/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiffs*