## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCHULTZ, *et al.*,<br><br>          Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>          Defendants. | Civil Action No. 18-120 (ABJ) |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants the District of Columbia (the District), Peter Newsham, Lamar Greene, Robert Alder, Jeffery Carroll, Keith Deville, Paul Niepling, Michael Howden, Melvin Washington, Gregory Rock, Daniel Thau, and Anthony Alioto (collectively, defendants), respectfully move under Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' Complaint [1] on the following grounds:

1. Defendants are entitled to qualified immunity against plaintiffs' constitutional claims brought under 42 U.S.C. § 1983 because plaintiffs fail to allege violations of their clearly established constitutional rights.

2. There was probable cause to arrest plaintiffs Schultz and Baker.

3. Plaintiffs fail to allege a basis to hold the District liable under 42 U.S.C. § 1983 for plaintiffs' constitutional claims.

4. Plaintiffs fail to state viable claims of negligence *per se* because, among other defects, the cited statutes do not impose specific duties on specific

actors and the Complaint does not allege that violations of these statutes caused plaintiffs' injuries.

These grounds are discussed in greater detail in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated:  March 30, 2018.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Chief, Equity Section

*/s/ Amanda J. Montee*
AMANDA J. MONTEE [1018326]
MATTHEW R. BLECHER [1012957]
ERIC U. JOHNSON [1030661]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-5691
(202) 741-8934 (fax)
amanda.montee@dc.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCHULTZ, *et al.,*<br><br>          Plaintiffs,<br><br>     v.<br><br>DISTRICT OF COLUMBIA, *et al.,*<br><br>          Defendants. | Civil Action No. 18-120 (ABJ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## INTRODUCTION

On January 20, 2017, thousands of people took to the streets of Washington, D.C., for demonstrations relating to the presidential inauguration. Although most of these demonstrations proceeded peacefully, one group of self-described anarchists and anti-fascists rioted across Northwest D.C., breaking storefront windows, tossing newspaper stands and trashcans into the street, and spray-painting and destroying vehicles. The District of Columbia Metropolitan Police Department (MPD) was tasked with controlling the violence and arresting the rioters, who responded by attacking and violently charging at MPD officers in a bid to escape arrest. Plaintiffs—all three of whom were arrested that day and subsequently indicted on felony charges by the United States Attorney's Office—have filed this action against the District of Columbia (the District) and many of the responding MPD officers. But as set forth below, the Complaint lack merit and should be dismissed.

## FACTS

On Inauguration Day 2017, while thousands of people protested peacefully in the District of Columbia, some demonstrators wearing masks and all black clothing engaged in acts of vandalism. *See* Compl. [1] ¶¶ 17, 29, 66. These individuals were in a group of hundreds that met at Logan Circle at approximately 10 a.m. and walked south, towards the National Mall. *Id.* ¶ 18, 20. Plaintiffs Jesse Schultz, III and John Baker were among them. *Id.* ¶¶ 20.

Fifteen minutes after the group left Logan Circle, members began destroying property. *Id.* ¶ 31. Chief Newsham and Assistant Chief Greene were monitoring the violence from the MPD Command Center. *Id.* ¶¶ 26–28. The on-scene commander, Keith Deville, declared that the demonstration had turned into a riot, and received an order from Newsham and Greene to stop the group. *Id.* ¶¶ 31–32.

The group continued to move throughout the area until "Cmdr. Deville, under the direction of Chief Newsham and Asst. Chief Greene, ordered MPD officers to establish a blockade at the corner of 12th and L Streets NW to trap individuals proceeding east on L Street NW." *Id.* ¶ 40. Officers detained approximately 200 individuals in a "kettle" at 12th and L Streets, N.W., *id.* ¶ 47. Plaintiffs Schultz, Baker, and Alexander Stokes Contompasis were detained in the kettle. *Id.* ¶¶ 56, 96. Contompasis alleges that while he was detained in the kettle, he was without food, water, and toilets. *Id.* ¶ 97.

2

## LEGAL STANDARD

Dismissal of a claim or complaint is appropriate when a party fails to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the factual allegations in the complaint must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)).

## ARGUMENT

**I.   Count I:  Schultz's and Baker's Fourth Amendment Unlawful Arrest Claims Should be Dismissed.**

  **A.   Count I Should Be Dismissed Because Plaintiffs Were Arrested Based on Probable Cause.**

Schultz and Baker allege they were arrested in violation of their Fourth Amendment rights and bring a § 1983 claim against the District and ten individual defendants:  Newsham, Greene, Deville, Alioto, Howden, Rock, Thau, Washington, Bogardus, and Hinostroza. Compl., ¶¶ 134–36. Because Schultz and Baker do not sufficiently allege a violation of their Fourth Amendment rights, their unlawful arrest claim should be dismissed.

"The Fourth Amended protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (citation omitted). A seizure is reasonable if it is supported by probable cause, which "exists 'when known facts and circumstances are sufficient to warrant [an officer] of reasonable prudence in the belief that an offense has been or is being committed.'" *Dukore v. District of Columbia*, 799 F.3d 1137, 1142 (D.C. Cir. 2015) (citation omitted). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Wesby*, 138 S. Ct. at 586 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "[P]robable cause is evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ronkim v. Vihn*, 71 F. Supp. 3d 124 (D.D.C. 2014) (internal quotation marks omitted). It "depends on the totality of the circumstances" and is "a flued concept." *Wesby*, 138 S. Ct. at 586 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Gates*, 462 U.S. at 243–44 n.13).

Taking the facts alleged in the Complaint as true, from the viewpoint of a reasonable police officer, there was probable cause to arrest Schultz and Baker under the totality of the circumstances. Under District law, it is a crime to engage

4

in a riot or willfully incite or urge others to riot. D.C. Code § 22-1322(b)–(c). A riot is "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a).

Schultz and Baker admit that they were travelling within a group that engaged in "acts of vandalism" within fifteen minutes of leaving Logan Circle. Compl. ¶¶ 29, 31. They also allege that although other people left the group after the violence began, they stayed. *Id.* ¶ 49. Plaintiffs allege that when Commander Deville declared the demonstration had turned into a riot, he "knew not all of the individuals who were marching were committing acts of vandalism." *Id.* ¶ 33. But not every member of a group must actually engage in vandalism for the entire group to be part of a riot; it is a crime to willfully incite or urge others to riot. D.C. Code § 22-1322(c). Officers may have probable cause to arrest individuals under the riot statute "if the group is observed violating the law even if the specific unlawful acts cannot be ascribed to individuals." *Carr v. District of Columbia*, 587 F.3d 401, 406 (D.C. Cir. 2009). And although plaintiffs allege they did not cheer for anyone who engaged in acts of vandalism, Compl. ¶ 54, the probable cause determination is evaluated from the perspective of a reasonable officer on the scene. *Wesby*, 138 S. Ct. at 586. Under the totality of the circumstances, it could have appeared to an objectively reasonable officer that there was a substantial chance Schultz and Baker were rioting or inciting or urging those with them to riot—sufficient to meet the probable cause threshold the Supreme Court characterized as "not a high bar." *Id.*

Finally, Schultz and Baker were indicted by a grand jury following their arrests. *See United States v. Schultz, III*, 2017 CF2 1164 (D.C. Sup. Ct); *United States v. Baker*, 2017 CF2 1150 (D.C. Sup. Ct). "In evaluating the presence or lack of probable cause, the court may consider a grand jury indictment as *prima facie* evidence of probable cause." *Moore v. Hartman*, 102 F. Supp. 3d 35, 115 (D.D.C. 2015) (citing *Moore v. Hartman*, 571 F.3d 62, 63, 67, 69 (D.C. Cir. 2009) (*Moore IV*)). "The D.C. Circuit has instructed that the plaintiff may rebut the presumption in this case by showing 'that the indictment was produced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.'" *Id.* (citing *Moore IV*, 571 F.3d at 69). The Complaint makes no allegations questioning the good faith of the grand jury proceedings against them.

### B. Defendants Are Entitled to Qualified Immunity Because It Was Not Clearly Established That Schultz's and Baker's Arrests Lacked Probable Cause.

#### 1. To Hold Individual Defendants Liable Under Section 1983, Plaintiffs Must Allege Facts Sufficient to Show the Defendant Is *Not* Entitled to Qualified Immunity.

Qualified immunity "is an *immunity from suit* rather than a mere defense to liability," so entitlement to immunity should be resolved "at the earliest possible stage of litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (emphasis in original). "At the motion to dismiss stage, a plaintiff must allege sufficient facts to establish that the defendants are *not* entitled to qualified immunity." *Patterson v. United States*, 999 F. Supp. 2d 300, 311 (D.D.C. 2013) (emphasis in original). "As laid out by the Supreme Court, the two pertinent

6

questions in determining whether qualified immunity applies are (1) 'whether a constitutional right would have been violated on the facts alleged,' and (2) 'whether the right was clearly established at the time of the violation.'" *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 54 (D.D.C. 2013) (citation omitted).

"'Clearly established' means that at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand what he or she is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). It requires the legal principle to be "settled law," "which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id.* at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42). It "also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).

"In order to find a supervisor personally liable in damages for the unconstitutional acts of his subordinate, it must be shown that he was responsible for supervising the wrongdoer; that a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances; and that, as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened." *Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C. Cir. 1987) (overruled in part by *Hartman v. Moore*, 547 U.S. 250 (2006)). "The supervisor[ ] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they may see." *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir.

2004). "In the absence of any such 'affirmative links,' the supervisors cannot be shown to have the requisite 'direct responsibility' or to have given 'their authorization or approval to such misconduct,' and the effort to hold them personally liable fades into *respondeat superior* or vicarious liability, clearly barred by § 1983." *Id.* at 27 (quoting *Rizzo*, 423 U.S. at 371, 376)).

2.   **Defendants Are Entitled to Qualified Immunity Because It Was Not Clearly Established That Schultz and Baker's Arrests Lacked Probable Cause.**

This "clearly established" component of qualified immunity is "especially important in the Fourth Amendment context" because "[g]iven its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)). Thus, the Supreme Court has "stressed the need to 'identify a case where an officer under similar circumstances … was held to have violated the Fourth Amendment.'" *Id.* (citation omitted). If there is no case on point, existing precedent must place the lawfulness of the particular arrest "beyond debate," except in the "rare 'obvious case,' where the lawlessness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (citation omitted).

Because this is not one of those rare obvious cases, plaintiffs must demonstrate that legal precedent of this Circuit placed it beyond debate that there was no probable cause to arrest them on Inauguration Day. Plaintiffs cannot meet this standard. To the contrary, the case law of this Circuit provides a legal basis for defendants' reasonable belief that there was probable cause to arrest Schultz and

Baker. *See Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009). And at minimum, *Carr* demonstrates that it was not "clearly established" that Schultz's and Baker's arrests were unlawful.

*Carr* was brought by five individuals who were arrested on January 20, 2005, during counter-inaugural demonstrations that turned violent. *Id.* at 403–405. Around 11:00 p.m. that day, approximately 250 to 300 individuals marched west on Columbia Road from its intersection with 16th Street, N.W. *Id.* at 403. As they marched, members of the group committed the following acts of vandalism: dragged newspaper vending machines into the street; broke windows or glass doors of businesses; spray painted buildings and cars; and threw objects at police cars. *Id.* at 404. Officers "witnessed the group cheering with members raising their arms in response to the destruction." *Id.* The commander ordered the protesters to be arrested, but many of them ran away first. Ultimately, 65 to 75 were arrested. *Id.*

The *Carr* plaintiffs challenged their arrests under the Fourth Amendment. *Id.* at 402. Reversing the district court's grant of summary judgment for the plaintiffs, the D.C. Circuit recognized that, "officers may be able to establish they had probable cause to arrest an entire group of individuals if the group is observed violating the law even if specific unlawful acts cannot be ascribed to specific individuals." *Id.* at 406. And although probable cause must be particularized, "that showing is satisfied if the officers have grounds to believe all arrested persons were part of a unit observed violating the law." *Id.* at 407. Meaning, "[p]olice witnesses must only be able to form a reasonable belief that the entire crowd is acting as a

9

unit and therefore all members of the crowd violated the law." *Id.* at 408. The court explained, "[t]o be sure, under the standard of our cases -- that the police are obliged to show that the crowd acted unlawfully as a unit -- it is possible that an entirely innocent person would be mistaken for a rioter. But it should be borne in mind that the legal issue is probable cause, not ultimate conviction. Probable cause only requires a reasonable belief of guilt, not a certitude." *Id.*

In light of the *Carr* precedent, plaintiffs cannot demonstrate it was clearly established that their arrests were unlawful. Like in *Carr*, plaintiffs allege that they were with a large group, Compl. ¶¶ 18, 20, that members of the group engaged in acts of vandalism, *id.* ¶ 29, and that they remained with the group at least 15 minutes after the vandalism began, as the group continued to travel together through the District, *id.* ¶¶ 20, 56. Under the totality of the circumstances and from the perspective of a reasonable officer on the scene, it was not clearly established under *Carr* or any other precedent that defendants lacked probable cause to arrest Schultz and Baker. As a result, defendants are entitled to qualified immunity.

C.   **Plaintiffs Fail to State a Claim for Unlawful Arrest in Violation of the Fourth Amendment Against Officers Howden, Rock, Thau, Washington and Sergeant Alioto Because They Fail to Allege These Defendants Arrested Them.**

Schultz's and Baker's Fourth Amendment unlawful arrest claims against Officers Howden, Rock, Thau, Washington, and Sergeant Alioto should be dismissed because plaintiffs fail to allege that these defendants arrested them. For Officers Howden, Rock, Thau, and Washington, plaintiffs allege:   (1) that these officers "were among the MPD officers who established the blockade" at the corner of 12th

and L Streets, N.W., *id.* ¶ 42, and (2) that the officers did not take "any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be in the kettle," *id.* ¶ 48. The allegations against Sergeant Alioto are the same, except that plaintiffs also allege Sergeant Alioto "was among the MPD officers who supervised establishment of the blockade." *Id.* ¶ 43.

Plaintiffs do not allege these defendants arrested them. And as for the allegation that defendants failed to ensure there was probable cause for detaining each individual in the kettle, there is no such obligation, *see Carr*, 587 F.3d at 408, particularly where the arrest decision was made by their supervisors, and not these defendants. Compl. ¶ 39. Plaintiffs have not stated a Fourth Amendment unlawful arrest claim against Officers Howden, Rock, Thau, Washington, or Sergeant Alioto.

## II.   Count II:  Schultz and Baker Fail to State a Claim for False Arrest.

### A.   Schultz and Baker Fail to State a Claim for False Arrest Because They Were Arrested Based on Probable Cause.

"In actions for false arrest and false imprisonment, the central issue is whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails." *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C. 1985). To prevail on their common law false arrest claim, plaintiffs "must demonstrate 'that the police acted without probable cause, in an objective constitutional sense, to effectuate his arrest.'" *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 214 (D.D.C. 2010) (citation omitted). "Constitutional and common law false arrest claims are generally analyzed as though they comprise a single cause of action. The elements of both

claims are substantially identical." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 989 (D.C. Cir. 2014).

Schultz and Baker bring a common law false arrest claim against the same defendants as their Fourth Amendment claim for arrest without probable cause. Compl. ¶¶ 137–43. For the reasons explained above, plaintiffs fail to allege their arrests lacked probable cause. Thus, their false arrest common law claim should be dismissed against all defendants.

**B.**  **Schultz and Baker Fail to State a Claim for False Arrest Against Officers Howden, Rock, Thau, Washington, Bogardus, Hinostroza, and Sergeant Alioto Because Defendants Acted In Good Faith Based on Reasonably Trustworthy Information.**

For the defendants who were ordered to arrest plaintiffs—Officers Howden, Rock, Thau, Washington, Bogardus, Hinostroza and Sergeant Alioto, Compl. ¶ 48— there is an additional basis for defendants' dismissal from plaintiffs' common law false arrest claim. "'[T]he law of this jurisdiction … also allows a lesser, partially subjective test to support a police officer's defense to a false arrest claim. Under the 'partially subjective test it,' 'it will suffice if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable.'" *Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009) (citation omitted). The officer may form his or her "good faith" belief based on "reasonably trustworthy information" he or she possessed the moment of the arrest. *Funchess v. United States*, 677 A.2d 1019, 1020–21 (D.C. 1996).

Under the facts as alleged by plaintiffs, Officers Howden, Rock, Thau, Washington, Bogardus, Hinostroza, and Sergeant Alioto relied on the probable

cause determinations made by their superiors. Compl. ¶ 48. Plaintiffs do not make any factual allegations that would support a finding that these officers lacked good faith in their reliance on the probable cause determination of their superiors, or that the determination was not reasonably trustworthy information under the circumstances. As a result, the partially subjective test warrants their dismissal.

III. **Count IV: Defendants are Entitled to Qualified Immunity on Schultz's and Baker's First Amendment Claim Because Plaintiffs Fail to Allege a Violation of Their Clearly Established Rights.**

To establish a First Amendment retaliation violation, *see* Compl. ¶¶ 144–45, plaintiffs must allege "(1) that [they] engaged in protected conduct, (2) that the government 'took some retaliatory action, sufficient to deter a person of ordinary firmness in plaintiff[s'] position from speaking again, and (3) that there exists 'a causal link between the exercise of a constitutional right and the adverse action taken against [them].'" *Daugherty v. Sheer*, 248 F. Supp. 3d 272, 283 (D.D.C. 2017) (quoting *Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015)). There is a "First Amendment right not to be arrested in retaliation for one's speech where there is otherwise no probable cause for the arrest." *Patterson v. United States*, 999 F. Supp. 2d 300, 310 (D.D.C. 2013) (citing *Dellums v. Powell*, 566 F.2d 167, 195–96 (D.C. Cir. 1977)).

However, there is no *clearly established* right to be free from a retaliatory arrest that is otherwise supported by probable cause. *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) ("Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a

retaliatory arrest that is otherwise supported by probable cause. This Court has never held that there is such a right."); *Dukore*, 799 F.3d at 1145 (finding no clearly established right to be free from First Amendment retaliatory arrest where there is probable cause); *Ronkin v. Vihn*, 71 F. Supp. 3d 124, 137 (D.D.C. 2014) (same). In other words, even if plaintiffs had sufficiently pled that they were arrested because they were engaged in protected speech activity, as long as their arrests were also supported by probable cause, defendants are entitled to qualified immunity.

As a result, Schultz's and Baker's First Amendment retaliation claims against Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza depend—like plaintiffs Fourth Amendment unlawful arrest claim—on whether under the totality of the circumstances a reasonable officer in their position would have believed there was probable cause to arrest Schultz and Baker. As explained above in Section I:  (1) there was probable cause to arrest Schultz and Baker; and (2) under the totality of the circumstances it was not clearly established that that the officers lacked probable cause to execute the arrests. Defendants are entitled to qualified immunity.

IV.  **Contompasis Fails to Allege Violations of Clearly Established Constitutional Rights Regarding the Conditions of His Confinement.**

A.  **Contompasis Does Not Sufficiently Allege Newsham, Alder, Carroll, or Niepling Deprived Him of Food, Water, or Toilets.**

Contompasis alleges he went a "prolonged period" without food, water, and toilets and that these deprivations amount to a violation of his Fifth Amendment due process rights and Fourth Amendment right to be free from unreasonable searches and seizures. Compl. ¶¶ 147–48. He alleges he was without access to a

toilet for 11 hours, *id.* ¶ 109, and 12 hours without food or drink, *id.* ¶ 110. Although he alleges "many demonstrators specially requested food, water and/or access to a toilet," *id.* ¶ 98, he does not allege he requested them. Contompasis names Newsham, Alder, Carroll and Niepling as defendants. *Id.* ¶¶ 147–48.

Plaintiff's factual allegations against each defendant are insufficient to allege that the defendant violated constitutional rights. The basis for plaintiff's claim against Chief Newsham is that he authorized the kettle and supervised the officers who maintained the kettle from the command center at MPD. *Id.* ¶ 97. Plaintiff does not allege Chief Newsham was present at the kettle or that he was even aware that plaintiff was without food, water, and toilets. Chief Newsham's position of authority and remote supervision of officers who maintained the kettle is an insufficient basis to find him liable, personally or through supervisory liability. *See Rizzo v. Goode*, 423 U.S. 362, 376 (1976).

For defendants Alder, Carroll, and Niepling, plaintiff alleges merely that they "failed to provide [him] with food, water, or access to a toilet." Compl. ¶ 97. But Contompasis does not allege that they were at the kettle during the entire duration or knew that plaintiff was without food, water, and toilets for the full duration. *Id.* ¶ 97. Based on the allegations in the Complaint, these defendants cannot be responsible for the alleged constitutional violation of Contompasis's rights.

### B.    Contompasis Does Not Allege a Violation of a Clearly Established Fifth Amendment Right.

Contompasis has not sufficiently alleged a constitutional violation under the Fifth Amendment. "[P]retrial detainees have an independent due-process right

15

under the Fifth and Fourteenth Amendments to humane conditions while incarcerated." *Estate of Gaither v. District of Columbia*, 655 F. Supp. 2d 69, 86 (D.D.C. 2009). A detainee's due-process rights are violated if the conditions of the pretrial confinement amount to punishment of the detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)). The factors in *Mendoza-Martinez* provide "useful guideposts in determine whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of the word." *Id.* at 538. They are:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry and may often point in differing directions.

*Mendoza-Martinez*, 372 U.S. at 168–69. "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538.

Contompasis does not allege that Newsham, Alder, Carroll or Niepling imposed pretrial conditions akin to punishment, and have not alleged facts to find the conditions of their confinement amounted to punishment under the *Mendoza-Martinez* guideposts. First, Contompasis does not allege that defendants intentionally deprived him of food, water, or toilets; instead he alleges defendants "failed to provide them" with food, water, and toilets. Compl. ¶ 97. Second, there is a

clearly a non-penal explanation for the deprivations. Contompasis was detained on a public street, not in a location with bathrooms or where the police would have access to food and water. *Id.* ¶ 96. He also admits there were nearly 200 individuals in the kettle, which is a significant number of individuals for the officers to manage. *Id.* ¶ 47. Complicating the situation further, it was Inauguration Day, when there were road closures and thousands of pedestrians. Under these circumstances and applying plaintiff's allegations to the guideposts outlined in *Mendoza-Martinez*, he has not alleged a deprivation that rises to the level of a due process violation.

Further, it was not clearly established that under these circumstances, Newsham, Alder, Carroll, and Niepling would violate plaintiff's Fifth Amendment rights if they did not ensure he received food, water, or bathrooms more promptly. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). There is no precedent in this jurisdiction that holds that due process requires arrestees to receive food, water, or access to toilets within a certain amount of time. There also are no similar cases in this jurisdiction which would establish the boundaries of a Fifth Amendment violation in this context; the right was not clearly established.

Other jurisdictions have found that comparable allegations do not reach the threshold of a due process deprivation. *See, e.g., Williams v. Dellorco*, No. 05-4129, 2007 U.S. Dist. LEXIS 85721, at *33 (D.N.J. Nov. 20, 2007) ("Even accepting, as Plaintiffs allege, that Defendants withheld food as a means of 'playing hardball' with them for declining to make statements to police, ten hours without food does not meet the threshold of constitutional concern. Effectively, Plaintiffs missed

breakfast on one occasion, which does not amount to a deprivation under the Fourteenth Amendment."); *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248 (N.D.N.Y. 2008) (dismissing plaintiff's constitutional claim where plaintiff was incarcerated at 5:35 p.m. and not given food or drink until the following morning); *Villari v. Township of Wall*, No. 06-0004, 2009 U.S. Dist. LEXIS (D. N.J. Sept. 15, 2009) (finding nine hours without food insufficient). But there are no clearly established rules for when deprivations of food, water, and toilets constitute a due process violation. Because Contompasis does not allege a violation of a clearly established right, defendants are entitled to qualified immunity.

### C.  <u>Contompasis Does Not Allege a Violation of a Clearly Established Fourth Amendment Right.</u>

Contompasis also has not stated a violation of an established right under the Fourth Amendment. Although some jurisdictions have held the Fourth Amendment governs conditions of confinement when an individual is post-arrest but pre-probable cause hearing, this jurisdiction has not. *See, e.g., Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006); *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011). Instead, in a case involving a plaintiff's condition of detention immediately post-arrest while he was in an MPD holding cell, this Court applied the Fifth Amendment due process standard. *See Robinson v. District of Columbia*, No. 03-1455, 2005 WL 491467, at *3 (D.D.C. March 2, 2005). Contompasis cannot allege a violation of a clearly established right under the Fourth Amendment where there is no guidance in this jurisdiction establishing the right.

## V. Plaintiffs Fail to Plead a Plausible Basis for Municipal Liability Under § 1983.

Plaintiffs contend that the District is responsible for the alleged constitutional violations in Counts I ("false arrest") and V ("conditions of pre-trial confinement"), but they have not pled sufficient facts to support municipal liability under 42 U.S.C. § 1983. Local governments, including the District, are "persons" for purposes of § 1983, but municipal liability cannot be predicated on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). Rather, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691).

The Circuit has identified four ways official municipal policy can be demonstrated:   (1) express municipal policy; (2) actions of a final municipal "policymaker"; (3) persistent conduct by non-policymakers (*i.e.*, "custom" with force of law); and (4) "deliberate indifference" to a risk of constitutional injury. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003) (citations omitted). Each theory has its own "elements," which a § 1983 plaintiff bears the burden of pleading in accordance with *Iqbal. Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). Additionally, under any theory, a municipal liability claim separately requires proof of causation—specifically, an "affirmative link" between the alleged municipal policy and the alleged constitutional violation, "such that [the former] was the moving force behind the [latter]." *Baker*, 326 F.3d at 1306.

19

Plaintiffs contend that the District is liable for the alleged constitutional violation in Count I because it was "caused by a policy, practice, or custom of responding to demonstrations at which some lawbreaking occurs by unlawfully detaining and/or arresting participants who [MPD has] no reason to believe have broken the law," Compl. ¶ 135, or alternatively, because Chief Newsham—allegedly in his role as "final decisionmaker"—"ratif[ied]" the actions that directly caused constitutional injury, *id.* ¶ 136. Count V, to the extent it is brought against the District, is based on this same ratification theory. *Id.* ¶ 148. To substantiate these contentions, plaintiffs further include seven individually numbered paragraphs under the heading, "Municipal and Supervisory Liability." *Id.* at ¶¶ 197–205. These allegations do not state a valid claim for municipal liability under any of the Circuit's theories for demonstrating a municipal policy.

### A.   Plaintiffs Fail to Allege an Express Municipal Policy.

Plaintiffs never state or even imply that the District had any *express* policy that facilitated the allegedly unlawful conduct at issue in Counts I and V. Nor could they:  the District's written municipal policy governing police conduct relating to First Amendment assemblies is set forth in D.C. Code § 5-331.01, *et seq.*, and specifically provides for "reasonable" policing of peaceful demonstrations on public space, *id.* §§ 5-331.03, 5-5-331.04(a), 5-331.07, explicitly prohibiting restrictions based on viewpoint discrimination, *id.* § 5-331.04(c), and instructing on the use of chemical irritants, *id.* § 5-331.16. In fact, plaintiffs' reliance on these provisions to establish the District's duty of care in handling First Amendment assemblies (*i.e.*,

as an element of negligence *per se*) effectively concedes that "[their] true grievance is not with a policy or custom of the District, but rather with [ ] specific [individual] decision[s]." *Coppet v. District of Columbia*, 75 F. Supp. 3d 144, 148 (D.D.C. 2014) (Berman Jackson, J.) (plaintiff's statement that municipal policy was "fair [o]n paper" undermined *Monell* claim absent allegation that a final policymaker's decision caused alleged departure from policy).

**B.    Plaintiffs Fail to Allege a Custom.**

Plaintiffs also fail to plead sufficient facts to show municipal liability based on "custom." To establish municipal policy arising from custom, a § 1983 plaintiff bears the burden of putting forth "evidence that the municipality's employees engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (Berman Jackson, J.) (citation omitted). Here, plaintiffs contend that "[t]he coordinated MPD response [on January 20, 2017, was] part of a custom of … responding with mass detentions and/or arrests to non-violent demonstrators at largely peaceful demonstrations where some law-breaking is occurring." Compl. ¶ 89. Plaintiffs contend that three events involving MPD response to large-scale protests—the latest of which occurred in January 2005—prove the existence of a broader custom of constitutional violations in January 2017. *Id.* at ¶ 90. Plaintiffs' assertion fails for three main reasons.

First, it is well-settled that the "persistent" and "pervasive" pattern necessary to show municipal custom cannot be inferred from events with no temporal

proximity to the conduct allegedly giving rise to a § 1983 plaintiff's constitutional injury. For example, in *Page v. Mancuso*, 999 F. Supp. 2d 269, 285 (D.D.C. 2013), the Court rejected as evidence of a pattern rising to the level of municipal policy the plaintiff's reference to "[two] cases from this district [that] previously recognized … a [District] policy of authorizing [the same type of conduct allegedly causing the plaintiff's injury]." As grounds, the Court in *Page* noted that the "policy being addressed [in the earlier cases] was one that existed at least seven years prior," and the plaintiff supplied no facts suggesting "the District persisted in its unconstitutional actions." *Id.* at 285-86. This Court reached substantially the same result in *Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014), declining to credit as evidence of municipal custom a report, a compilation of statistics, and a district court opinion that predated the plaintiff's alleged injury by six, nine, and four years, respectively. *Id.* at 43. The same rationale is dispositive of plaintiffs' municipal custom claim:  events occurring between *twelve and seventeen years* prior to the incident that resulted in plaintiffs' alleged constitutional injuries are simply too far removed to plausibly infer an underlying municipal custom.

Second, to prove the existence of municipal custom, a § 1983 plaintiff is required to identify past events involving government actions that are *prima facie* identical to the alleged wrongdoing underlying her claim. *Egudu*, 72 F. Supp. 3d at 41 (report "analyz[ing] data related to disorderly conduct arrests [but] tailored toward exposing racial disparities" could not show policy or custom of "violat[ing] an individual's free speech right or the right to be free from an unlawful seizure");

*Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133-34 (D.D.C. 2011) (report could not evidence municipal custom where "plaintiff was not arrested for the offense examined in the report"). Plaintiffs, however, describe MPD's "response" to demonstrations in 2000, 2002, and 2005 using only legal conclusions ("unconstitutional" detention), buttressed by generic and over-generalized assertions of presumptively unlawful police activity ("mass arrests," "den[ial] … of access to food and water"). Compl. ¶ 90. "[W]ithout some further factual enhancement," *Iqbal*, 556 U.S. at 678, there is simply no way to determine whether any of the events to which plaintiffs refer are relevant to their claim of municipal liability based on custom. *Cf. Blue*, 811 F.3d at 20 (requiring § 1983 plaintiff to plead "elements" of municipal liability with "adequate factual support to 'state a claim to relief that is plausible on its face,'" as required by *Iqbal*).[1]

Finally, even if plaintiffs had pled sufficient facts to establish the municipal custom they allege in the Complaint—"a custom of … responding with mass detentions and/or arrests to non-violent demonstrators at largely peaceful

---

[1]   Even if the Court looks beyond the pleadings, the 2000, 2002, and 2005 events plaintiffs cite involved markedly different circumstances. For example, MPD's response to "counter-inaugural demonstrations in Adams Morgan in January 2005," presumably a reference to an incident subsequently challenged as *Carr v. District of Columbia*, involved the arrest of 65 to 75 people for parading without a permit. 587 F.3d 401, 404 (D.C. Cir. 2009). Not only were plaintiffs "not arrested for [that] offense," *Hunter*, 824 F. Supp. 2d at 133, there was also no finding in that case that MPD lacked probable cause to arrest the plaintiffs for rioting, the charge plaintiffs seek to challenge here in Count I, *Egudu*, 72 F. Supp. at 43 ("Plaintiff takes no steps to demonstrate how many of [the 5,338 arrests for disorderly conduct in 2009] raised constitutional concern," and the arrests, "without more," do "not demonstrate a custom of constitutional violations").

demonstrations where some law-breaking is occurring," Compl. ¶ 89—they would have only arguably provided a basis for municipal liability as to one of their § 1983 claims:   Count I ("false arrest"). The other—Count V ("conditions of pre-trial confinement")—has nothing to do with an alleged custom that promotes the use of "mass detentions and/or arrests [of] non-violent demonstrators." *Baker*, 326 F.3d at 1306 (causation required). Plaintiffs appear to acknowledge as much by only expressly mentioning ratification as a basis for municipal liability in Count V.

**C.**   <u>**Plaintiffs Fail to Allege Deliberate Indifference**</u>.

Plaintiffs also fail to plausibly demonstrate municipal liability on a "deliberate indifference" theory, and in particular, based on the assertion that the allegedly unlawful actions underlying Count I resulted from "the District's failure to train MPD officers." Compl. ¶ 91. As the Supreme Court has cautioned, "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). Only if a failure to train amounts to "'deliberate indifference' to the rights of [the municipality's] inhabitants," such that it can "be properly thought of as a city 'policy or custom,'" is it "actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Deliberate indifference in this context is an objective but "stringent standard of fault," *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997), requiring that city policymakers both:   (1) had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights,"

*Connick*, 563 U.S. at 61; and (2) made a "deliberate choice" not to act, *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials"); *accord Harvey v. District of Columbia*, 798 F.3d 1042, 1053 (D.C. Cir. 2015). Here, the Complaint does not establish a plausible basis for either element.

### 1.   Plaintiffs Do Not Allege Notice.

To establish the notice element of their deliberate indifference failure-to-train claim, plaintiffs rely upon the same prior incidents that underlie their assertion of a municipal custom, Compl. ¶ 90, which similarly fails here. The notice element of a deliberate indifference municipal liability claim "ordinarily" requires proof of "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 61. Based on the evidence presented, "the need for more or different training [must be] obvious," and the inadequacy in the training program must be "likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390.

As in the municipal custom context, temporal proximity is crucial to establishing government notice for deliberate indifference claims. For example, in *Dormu v. District of Columbia*, the Court refused to assume "that the District continued to be on notice [of a practice of improper conduct] four years [after first receiving notice that the conduct was occurring]." 795 F. Supp. 2d 7, 26 (D.D.C. 2011). Likewise, in *Robinson v. District of Columbia*, the Court rejected the plaintiff's deliberate indifference notice evidence, despite finding that it "reflect[ed]

an awareness by the District of serious allegations relating to [the conduct at issue]," explaining that "a mere awareness of a problem in January 1999 and a need for improvement is not, as a matter of law, sufficient to impose municipal liability for an incident that occurred in October 2000." 403 F. Supp. 2d 39, 55 (D.D.C. 2005); *accord Moore v. District of Columbia*, 79 F. Supp. 3d 121, 140 (D.D.C. 2015) (approximately eight-year-old study showing pattern of challenged conduct "too remote" to support plaintiff's deliberate indifference notice claim); *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 140 (D.D.C. 2003) (notice of problem in 1999 insufficient to impose municipal liability for an incident in 2001). As noted above, the latest of plaintiffs' prior incidents occurred in 2005, twelve years before the events underlying Count I, Compl. ¶ 90, with countless demonstrations occurring on District streets during that time; it is plainly not plausible, without more, that those prior events put the District on notice of a risk that plaintiffs were "likely" to suffer constitutional injury absent some further training, *City of Canton*, 489 U.S. at 390 (notice requires that constitutional injury is "likely to result").

Moreover, plaintiffs nowhere allege anything regarding "particular omission[s]," *Connick*, 563 U.S. at 61, in the District's training regarding police handling of violent criminal activity arising out of demonstrations. In fact, the Complaint states nothing about the training (neither subject matter nor frequency) that MPD officers receive; nor does it identify particular deficiencies in any such training program or how it could have been improved. As this Court has observed, a § 1983 plaintiff who "includes no specific details about police training in the District

or how it might be deficient," fails to "supply [necessary] facts from which a court could draw the inference that the District ignored a known risk [of constitutional injury]." *Miango v. Democratic Republic of the Congo*, 243 F. Supp. 3d 113, 128 (D.D.C. 2017) (Berman Jackson, J.) (citing *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 158 (D.D.C. 2015) for the proposition that "[t]he complete absence of any factual allegations concerning a specific shortcoming in training forecloses any plausible inference of 'actual or constructive knowledge' by District policymakers that its officers will 'probably violate constitutional right'"). Plaintiffs' deliberate indifference theory of municipal liability fails for the same reason: "Since the [C]omplaint contains no factual allegations detailing any deficiencies in MPD training on how officers should respond to violence committed [at public demonstrations], plaintiffs' § 1983 allegations amount to nothing more than simpl[e] formulaic recitation of the elements of a deliberate indifference claim, and dismissal is warranted." *Miango*, 243 F. Supp. 3d at 128–29 (citation and internal quotation marks omitted).

## 2.   Plaintiffs Fail to Allege Deliberate Indifference.

Even if plaintiffs could establish notice, other evidence reasonably inferred from plaintiffs' pleadings undermines their contention that the District made a "deliberate choice" not to act, *Pembaur*, 475 U.S. at 483, in response to the 2000, 2002, and 2005 incidents featured in the Complaint, Compl. ¶¶ 90-91. Most notably, plaintiffs make numerous references to the First Amendment Assemblies Act (FAAA). That legislation, which explicitly requires, among other things, "regular

and periodic training" for MPD personnel "on the handling of, and response to, First Amendment assemblies," was passed by the Council after, and as the legislative history confirms, D.C. Comm. Rep., B. 15-968 (2004), *in response to*, the incidents cited by plaintiffs. D.C. Code § 5-331.15. It is simply not plausible to conclude that the District remained deliberately indifferent to the risk of constitutional violations at public assemblies, having passed comprehensive legislation to reform municipal policy relating to that subject matter. Plaintiffs do not challenge that legislation, or the training program it required, as inadequate, further evidencing that the District responded appropriately, not with deliberate indifference. *Egudu*, 72 F. Supp. at 45 (finding District's change in training and procedures following events serving as notice of potential constitutional violations, in conjunction with plaintiff's failure to challenge changes as inadequate, "tend[ed] to support the conclusion that the District did not remain deliberately indifferent").

### D.   Plaintiffs Fail to Allege Actions of a Final Policymaker.

Finally, plaintiffs have not alleged sufficient facts to establish that their alleged constitutional injuries were caused by the actions of a final municipal policymaker. Plaintiffs appear to focus their policymaker claim exclusively on Chief Newsham, suggesting he either ordered, or later ratified, the actions of the individual officers who directly caused plaintiffs harm. Compl. ¶¶ 92–95, 136, 148. Even if Chief Newsham's actions proximately caused plaintiffs' injuries or could be characterized as deliberately indifferent—two doubtful propositions discussed

further below—they are not attributable to the District because the Chief is not a final municipal policymaker.

"The Supreme Court narrowly interprets [the term municipal] 'policymaker' for the purposes of § 1983 liability, and discretion in a job function is not enough." *Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 42 (D.D.C. 2014) (Berman Jackson, J.) (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (O'Connor, J., plurality op.)); *accord Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014) (statutory discretion to make final decisions in individual cases "is insufficient to create municipal liability [for those decisions] unless the decisionmaker [also] had been granted final policymaking authority under D.C. Law in the [relevant subject-matter] area"). Rather, "an individual must 'speak with final policymaking authority for the local governmental actor' as established by state law." *Allen-Brown*, 54 F. Supp. 3d at 42 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 709 (1989)). "'[W]hen [according to state law] a subordinate's decision is subject to review by the municipality's authorized policymakers,' those policymakers 'have retained the authority to measure the official's conduct for conformance with *their* policies.'" *Miner v. District of Columbia*, 87 F. Supp. 3d 260, 266 (D.D.C. 2015) (quoting *Praprotnik*, 485 U.S. at 127) (emphasis in original).

Under District law, all members of the police force, including the Chief of Police, are subordinate to the Mayor and (ultimately) the Council, and thus non-policymakers for purposes of municipal liability. As the Court in *Miner* explained:

> In the District of Columbia, the Mayor is ultimately responsible for the police department, *see* D.C. Code § 5-101.03, and the Mayor appoints a

> Chief of Police, 'with the advice and consent of the [City] Council," D.C.
> Code § 5-105.01(a-1)(1), to administer the police department. All police
> officers are required to "respect and obey the Chief of Police as the
> head and chief of the police force, subject to the rules, regulations, and
> general orders of the Council [ ] and the Mayor [ ]." D.C. Code § 5-
> 127.03.

87 F. Supp. 3d at 266. These provisions establish that all police officers and

command officials, including the Chief, are subordinate to the policymaking

authority of the Mayor, as ultimately constrained by the "rules, regulations, and

general orders," which are within the Council's purview to issue. *See id.* ("Thus, by

law, police officers below the level of the Chief of police—and, arguably, the Chief

herself … are subordinates [under the meaning of Supreme Court precedent]");

*accord Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (fire

chief and assistant fire chief are not policymakers for municipal liability purposes

because the "Mayor and the City Council have expressly reserved supervisory

powers to themselves"). Against this backdrop, regardless of any individually-

named defendants' involvement in MPD's response to the events at issue in

plaintiffs' Counts I and V, their actions are not, as a matter of law, attributable to

the District for municipal liability purposes.

This conclusion makes particular sense in the context of policing First

Amendment assemblies, where the Council has generated comprehensive, express

municipal policy governing police conduct. *See* D.C. Code § 5-331.01, *et seq.* It is

true that all members of the police force, including the Chief, are authorized to

make arrests based on probable cause, *Wesby*, 138 S. Ct. at 587, and use force when

reasonably necessary, *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 193

(D.D.C. 2015); however, as the Circuit has reminded, "discretion is insufficient to create municipal liability unless the decision maker had been granted final policy making authority under D.C. law in the area [at issue in plaintiffs' complaint]." *See Singletary*, 766 F.3d at 74 (citing *Pembaur*, 475 U.S. at 480-81, 481–83 & n.12; *Praprotnik*, 485 U.S. at 129–30). Here, against the backdrop of the policies and procedures set forth in the FAAA, that authority was lacking. The Chief was constrained by those policies and procedures when he allegedly directed the MPD response to the violent protest activities on January 20, 2017, as well as when he later defended the department's actions to the media; any alleged decision that departed from express District policy was not an act of the municipality for purposes of § 1983. *See Singletary*, 766 F.3d at 74 ("The board thus was 'constrained by polices not of [its] making,' and its decision to 'depart[ ]' from those policies by revoking [the plaintiff's] parole based on unreliable hearsay was not an 'act of the municipality' for purposes of § 1983.").

Even if Chief Newsham qualifies as a final municipal policymaker, plaintiffs' attempt to hold the District liable for their constitutional injuries on the ground that the Chief ratified the actions of his subordinates shortly after Inauguration Day is suspect for other reasons. *See* Am. Compl. ¶¶ 204–05. Although the D.C. Circuit has not addressed the issue, several other circuits have acknowledged that municipal liability under § 1983 can be based on a final-policymaker-ratification theory. However, "[t]he final policymaker must not only approve the [subordinate's] decision, but also adopt the basis for the decision, and the ratification must be the

moving force, or cause, of the alleged constitutional violation. *Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) (citing *Praprotnik*, 485 U.S. at 127); *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946-47 (8th Cir. 2017) ("ratification requires both knowledge of the alleged constitutional violation, and proof that the policymaker specifically approved the subordinate's act").

Plaintiffs' allegations regarding ratification by Chief Newsham fail under this standard for two main reasons. First, the Chief's general statements in defense of his officers' conduct on Inauguration Day, Compl. ¶¶ 92–95, are not the sort of "specific [ ] approv[al]" required to establish ratification of a non-policymaker's conduct. *Soltesz*, 847 F.3d at 946. To the contrary, "good faith statements [by a policymaker] made while defending complaints of constitutional violations by [non-policymaker] employees do not generally demonstrate ratification." *Davidson v. City of Stafford*, 848 F.3d 384, 395–96 (5th Cir. 2017) (citation omitted); *accord Peterson v. City of Forth Worth*, 588 F.3d 838, 848 (5th Cir. 2009) ("a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality"). Second, it is entirely impossible for plaintiffs to establish a causal nexus between the Chief's subsequent defense of his officers' conduct—the supposed "ratification," according to plaintiffs—and any of the constitutional violations alleged in the Complaint. Regardless of the approach in other circuits, causation is an essential element of a § 1983 municipal liability claim under this Circuit's precedent, *Baker*, 326 F.3d at 1306, and plaintiffs' ratification

theory of the District's liability fails as a matter of law to establish it. Accordingly, both 42 U.S.C § 1983 claims against the District should be dismissed with prejudice.

## VI.   Counts III and VI:  Plaintiffs' Negligence *Per Se* Claims Must Fail.

Plaintiffs bring two claims under theories of negligence *per se*. *See* Compl. ¶¶ 137–45, 149–50 (Counts III and VI). Each of these claims is based on provisions of the FAAA, D.C. Code § 5-331.01 *et seq.*, including First Amendment assemblies (Count III), dispersal orders (Count III), use of police lines (Count III), and access to food (Count VI). As set forth below, these claims must fail.

"To establish negligence under D.C. law, a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 514 (D.C. Cir. 2010) (citing *District of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 642 n.3 (D.C.2005) (en banc)). "Violation of a statute or regulation may constitute negligence *per se* only if the statute is meant to promote safety, if the plaintiff is a member of the class to be protected by the statute, and if the defendant is a person upon whom the statute imposes specific duties." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039–40 (D.C. 2014) (citations and internal quotation marks omitted); *see also Jarrett v. Woodward Bros.*, 751 A.2d 972, 977 (D.C. 2000) (discussing whether statute could provide "the requisite duty and standard of care"). Plaintiffs' negligence *per se* claims do not meet this standard and thus lack the requisite duty and standard of care. These claims must therefore be dismissed.

**A. Plaintiffs May Not Maintain Negligence *Per Se* Claims Against Any Individual Defendants Because the Cited Regulations Do Not Impose Duties on Any Individual Defendants.**

A negligence *per se* claim may only be maintained against "a person upon whom the statute imposes specific duties." *See Night & Day Mgmt.*, 101 A.3d at 1039–40 (citations omitted); *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996) ("The statute must also 'impose specific duties on the defendant.'" (quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982)); *Ginsberg v. Granados*, 963 A.2d 1134, 1141 (D.C. 2009) ("Because the FYCA in no way promotes public safety and imposes no duties on opposing counsel, Ginsberg's negligence *per se* claim must also fail."). The District of Columbia Court of Appeals has thus found that statutes placing burdens on "[a] retail licensee" and "any officer" imposed duties on specific actors. *See Night & Day Mgmt.*, 101 A.3d at 1040 (noting that regulation prohibiting a retail licensee from permitting underage drinking at a licensed establishment could form basis for claim of negligence *per se*); *cf. White*, 442 A.2d 163–64 & n.12 (discussing evidence of detective's violation of statutory provision prohibiting use of excessive force by "[a]ny officer"); *see also Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 152–53 (D.D.C. 2017) (discussing D.C. Code § 5-125.03, which prohibits use of chokeholds by "any police officer"), *appeal dismissed,* No. 17-7074, 2017 WL 5157752 (D.C. Cir. Oct. 31, 2017). Unlike these regulations, the FAAA provisions upon which plaintiffs base their claims of negligence *per se* do not impose specific duties on any individual defendant—as

opposed to MPD or the District as a whole—and therefore cannot support a claim

for negligence *per se*.

Count III relies, in part, upon D.C. Code § 5-331.08, which provides:

No emergency area or zone will be established by using a police line to encircle, or substantially encircle, a demonstration, rally, parade, march, picket line, or other similar assembly (or subpart thereof) conducted for the purpose of persons expressing their political, social, or religious views except where there is probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts (other than failure to have an approved assembly plan) and the police have the ability to identify those individuals and have decided to arrest them; provided, that this section does not prohibit the use of a police line to encircle an assembly for the safety of the demonstrators.

D.C. Code § 5-331.08. On its face, the statute imposes no specific duties on any

individual officer; it therefore cannot form the basis for a claim of negligence *per se*.

In addition, any burden arising from this provision's language cannot logically lie

with any individual officer but must instead lie with the District.

Count III suffers a similar defect to the extent it is based upon D.C. Code § 5-

331.04(c), which states:

No time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly, or on factors such as the attire or appearance of persons participating or expected to participate in an assembly, nor may such restrictions favor non-First Amendment activities over First Amendment activities.

D.C. Code § 5-331.04(c). On its face, this provision imposes no duty on any

individual officer. Reading this subpart—which relates to time, place, and manner

restrictions on First Amendment assemblies—within the context of D.C. Code § 5-

331.04's other subparts makes clear that the only duties created lie with the MPD

as a whole and not any specific officer. *See* D.C. Code § 5-331.04 ("*The MPD* may enforce reasonable time, place, and manner restrictions on First Amendment assemblies by..." (emphasis added)). As a result, D.C. Code § 5-331.04(c) cannot form the basis for a claim of negligence *per se*.

Other FAAA provisions upon which plaintiffs base Count III and the provision upon which plaintiffs base Count VI expressly place duties not on any individual but on the MPD as a whole, commanding that "*the MPD shall*" take or abstain from action. *See* D.C. Code § 5-331.07(b)(1) (emphasis added) (Count III); D.C. Code § 5-331.07(c) (Count III); D.C. Code § 5-331.07(e)(1) (Count III); D.C. Code § 5-331.12(b)(2) (Count VI).

That other sections of the FAAA place specific burdens on specific actors makes clear that provisions lacking such specificity "do not impose specific duties on [any] defendant." *See Night & Day Mgmt.*, 101 A.3d at 1039–40. *Cf.* D.C. Code § 5-331.06(b)(1) ("The Chief of Police shall..."); D.C. Code § 5-331.16(b)(3) ("A commanding officer...shall...").

Because the FAAA provisions upon which plaintiffs base their negligence *per se* claims do not impose any specific duties upon any of the individual defendants, they cannot give rise to claims for negligence *per se* against them. Counts III and VI must therefore be dismissed as against all individual defendants.

**B.    The Cited FAAA Provisions Cannot Form the Basis for Negligence *Per Se* Because They Do Not Impose "Specific" Duties.**

A statute will support a claim for negligence *per se* "only" if it "imposes specific duties." *Night & Day Mgmt.*, 101 A.3d at 1039–40. Thus, if a statute

provides actors with discretion or essentially restates the common law standard of reasonable care, it cannot form the basis for negligence *per se*. *See id.* at 1040 (stating that "the statute or regulation must not merely repeat the common law duty of reasonable care, but must set forth specific guidelines to govern behavior" and finding that requirements using terms "sufficient" and "adequate" grant "considerable discretion and do not specifically outline any standards" to support negligence *per se*); *see also Gadaire v. Orchin*, 197 F. Supp. 3d 5, 14 (D.D.C. 2016); *McNeil Pharm.*, 686 A.2d at 579; *Chadbourne v. Kappaz*, 779 A.2d 293, 296–97 (D.C. 2001). The FAAA provisions upon which plaintiffs rely do not meet this standard.

Count III rests, in part, on the alleged violation of D.C. Code § 5-331.08 (Use of police lines). This regulation permits MPD to use police lines to encircle, *i.e.*, "kettle," only "where there is *probable cause* to believe that a *significant number or percentage* of the persons located in the area or zone have committed unlawful acts … and the police have the ability to identify those individuals and have *decided* to arrest them." D.C. Code § 5-331.08 (emphasis added). This regulation does not contain specific guidelines sufficient to support a claim of negligence *per se*.

Probable cause is an inherently non-specific matter. The Supreme Court has described the probable-cause standard as "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which *reasonable and prudent* men, not legal technicians, act." *Pringle*, 540 U.S. at 370 (citations and internal quotation marks omitted) (emphasis added); *see also id.* at

371 ("The probable-cause standard is incapable of precise definition..."). Similarly, the District of Columbia Court of Appeals has boiled the standard down to "a reasonable ground for belief of guilt." *Perkins v. United States*, 936 A.2d 303, 305–06 (D.C. 2007) (citations omitted). Because this regulation relies on an imprecise standard like probable cause—which itself relies on a generalized conception of reasonableness—it lacks the requisite specificity. This regulation cannot form the basis for negligence *per se* for two additional reasons:  the regulation's use of "a significant number or percentage of persons located in the area or zone" is inherently imprecise, *see Significantly*, OXFORD ENGLISH DICTIONARY (3d ed. 2011) ("1. Highly expressive or suggestive; loaded with meaning...4. Sufficiently great or important to be worthy of attention; noteworthy; consequential, influential."), and the regulation's applicability turns on MPD's exercise of discretion to arrest. *See, e.g.*, *Night & Day Mgmt.*, 101 A.3d at 1039–40.

Count III's reliance on D.C. Code § 5-331.07(b)(1) and D.C. Code § 5-331.07(c) is equally unavailing. These provisions simply rely on general reasonableness principles. D.C. Code § 5-331.07(b)(1) ("reasonably possible"; "as appropriate"); D.C. Code § 5-331.07(c) ("reasonably possible"). Both provisions also grant MPD considerable discretion. D.C. Code § 5-331.07(b)(1) ("by issuing citations to, *or* by arresting" (emphasis added)); D.C. Code § 5-331.07(c) ("by dispersing, controlling, *or* arresting" (emphasis added)). And D.C. Code § 5-331.07(b)(1) also turns in part on probable cause. These provisions cannot form the basis for negligence *per se*.

D.C. Code § 5-331.07(e)(1) similarly cannot form the basis for Count III because it, too, turns on MPD's exercise of discretion to issue a dispersal order and merely restates a general reasonableness standard. *See* D.C. Code § 5-331.07(e)(1).[2] This provision also fails to provide a basis for negligence *per se* because plaintiffs do not allege that MPD ever made a determination to disperse any First Amendment assembly; thus, on plaintiffs' own allegations, D.C. Code § 5-331.07(e)(1) simply does not apply.[3]

Count III must also fail to the extent it relies upon D.C. Code § 5-331.04(c), which simply restates general First Amendment principles. *Cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227-28 (2015). In essence, this provision simply states: MPD may not violate the First Amendment. The resulting First Amendment analysis would not be the type of simple compliance/non-compliance question generally at issue in claims of negligence *per se. See, e.g., McNeil Pharm.*, 686 A.2d at 580–81 (citing cases with straightforward compliance analyses, *e.g.*, "building

---

[2]    This section provides:

> If and when the *MPD determines* that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants *a reasonable and adequate* time to disperse and a clear and safe route for dispersal.

D.C. Code § 5-331.07(e)(1) (emphasis added).

[3]    D.C. Code § 5-331.07 does not require dispersal orders be given in lieu of, or before, arrest. Rather, it permits MPD to respond to unlawful conduct by "dispersing, controlling, or arresting the persons engaged in such conduct." D.C. Code § 5-331.07(c). Moreover, dispersal would be inconsistent with a decision to arrest in accordance with D.C. Code § 5-331.08.

code violated where doors were unlawfully locked on inside; restaurant employee unable to escape assailant and was fatally stabbed" (citation omitted)). This provision simply does not provide the type of specific guidance necessary to sustain negligence *per se*.

Count VI relies upon D.C. Code § 5-331.12(b)(2), which, again, simply restates general reasonableness standards. *See* D.C. Code § 5-331.12(b)(2) ("reasonable"; "appropriate"). This type of language does not amount to specific guidance upon which to base a claim of negligence *per se*. *See, e.g., McNeil Pharm.*, 686 A.2d at 579; *see also Thoma v. Kettler Bros.*, 632 A.2d 725, 727 & 728 n.8 (D.C. 1993).

### C. Plaintiffs Do Not Allege Injuries Proximately Caused by the Violation of Any FAAA Provision and of a Type the FAAA Was Designed to Prevent.

To prevail under a theory of negligence *per se*, a plaintiff must show that "the violation was the proximate cause of the injuries, and the alleged injuries were of the type which the statute was designed to prevent." *See, e.g., McNeil Pharm.*, 686 A.2d at 578 (citations omitted). "Proximate cause has two components: 'cause-in-fact' and a 'policy element' which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or 'highly extraordinary' in retrospect." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (citation omited). The cause-in-fact prong is satisfied where the actor's conduct was a substantial factor in bringing about the harm. *See, e.g., Majeska*, 812 A.2d at 951 (citation omitted). But conclusory allegations do not suffice. *See Johnson v.*

*Sullivan*, 748 F. Supp. 2d 1, 9 (D.D.C. 2010); *see also Maddox v. Bano*, 422 A.2d 763, 764 (D.C. 1980). The Complaint does not meet this standard.

The Complaint's allegations do not demonstrate that the violation of the cited FAAA provisions was a substantial factor in bringing about plaintiffs' alleged injuries. Rather, the Complaint simply identifies FAAA provisions that plaintiffs allege defendants have violated but does not allege how those violations caused them any injuries or even that they suffered any compensable injury at all. *See, e.g.*, Compl. ¶¶ 138–45, 149–50. Because plaintiffs have not even alleged injury, their negligence *per se* claims must fail. *See, e.g.*, *McNeil Pharm.*, 686 A.2d at 578. In any event, plaintiffs have also failed to allege that the violation of any FAAA provision caused them injury of a type against which the FAAA provision was intended to prevent.

Count III relies on D.C. Code § 5-331.08, which prohibits police from "kettling" groups "except where there is probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts … and the police have the ability to identify those individuals and have decided to arrest them." Because probable cause existed to arrest Schultz and Baker specifically, *see* above Part I.A, they have not alleged a violation of the cited provision. For this same reason, plaintiffs have not alleged violations of D.C. Code § 5-331.07(b)(1) or (c), which also permit arrest. Plaintiffs reliance on D.C. Code § 5-331.07(c) is particularly unavailing because that provision specifies the circumstances under which MPD may issue a general dispersal order, yet plaintiffs

41

have not alleged that MPD ever issued a general dispersal order. Because a negligence *per se* claim requires that a violation of the cited regulation be the proximate cause of injury, this claim must fail.

To the extent Schultz and Baker rely on a violation of D.C. Code § 5-331.04(c), Count III must also fail. That provision repeats general First Amendment principles and is, on its face, intended to protect First Amendment interests. The only First Amendment-type injury plaintiffs allege (to the extent they allege one) is that they were arrested based on an association with individuals dressed in all black. Compl. ¶ 138. But because probable cause independently existed for their arrest, *see* Part I.A above, any violation of this statute could not have proximately caused their injury.

Plaintiffs similarly fail to allege a violation of D.C. Code § 5-331.07(e)(1), which relates to dispersal of First Amendment assemblies. But this provision only applies when "MPD determines" that a First Amendment assembly should be dispersed; because the Complaint does not allege that MPD ever made such a decision, it does not allege that the provision was triggered, let alone violated. As a result, plaintiffs have not alleged that the violation was the proximate cause of their injuries. And even if plaintiffs had alleged that violation of the regulation was a substantial factor in causing injury, any injury could not have been "of the type which the statute was designed to prevent." *See McNeil Pharm.*, 686 A.2d at 578. On its face, D.C. Code § 5-331.07(e)(1) is meant to prevent injuries to individuals during dispersal. *See* D.C. Code § 5-331.07(e)(1) ("If and when the MPD determines

that a First Amendment assembly, or part thereof, should be dispersed, the MPD …

shall provide the participants … a clear and safe route for dispersal."). Because

plaintiffs have not alleged that they were injured because of, or during, an MPD-

ordered dispersal, any injuries could not have been within the scope of D.C. Code §

5-331.07(e)(1)'s protections.

Count VI relies on D.C. Code § 5-331.12(b)(2), which requires the MPD to

"provide to any person not released within a reasonable time of arrest food

*appropriate to the person's health.*" D.C. Code § 5-331.12(b)(2) (emphasis added).

The specific reference to a "person's health" makes clear that this provision is not

meant as a duty to provide snacks to prevent "hunger" and "discomfort," *see,* ¶ 112,

but to protect individuals for whom a delay in food or consumption of inappropriate

food would affect the person's *health,* such as diabetics or those with serious

allergies. Plaintiffs do not allege that a delay in being fed was inappropriate to their

health or that they were. As a result, they have not alleged any violation, and this

claim must fail.

**D.** <u>**Count III Fails to the Extent it is Based on D.C. Code § 5-331.04(c) or D.C.**</u>
<u>**Code § 5-331.07(c) Because These Provisions Do Not Promote Public**</u>
<u>**Safety.**</u>

A statute or regulation cannot form the basis for a negligence *per se* claim

unless it promotes public safety. *Night & Day Mgmt.,* 101 A.3d at 1039–40; *see also*

*Ginsberg,* 963 A.2d at 1140; *McNeil Pharm.,* 686 A.2d at 579.

Count III cites D.C. Code § 5-331.04(c), which states:

No time, place, or manner restriction regarding a First Amendment
assembly shall be based on the content of the beliefs expressed or

43

> anticipated to be expressed during the assembly, or on factors such as the attire or appearance of persons participating or expected to participate in an assembly, nor may such restrictions favor non-First Amendment activities over First Amendment activities.

D.C. Code § 5-331.04(c). The plain language of D.C. Code § 5-331.04(c) makes clear that its intent is not to promote public safety but to protect the public's First Amendment interests.

Count III also cites D.C. Code § 5-331.07(c), which states:

> Where participants in a First Amendment assembly, or other persons at the location of the assembly, engage in unlawful disorderly conduct, violence toward persons or property, or unlawfully threaten violence, the MPD shall, to the extent reasonably possible, respond by dispersing, controlling, or arresting the persons engaging in such conduct, and not by issuing a general order to disperse, *thus allowing the First Amendment assembly to continue.*

D.C. Code § 5-331.07(c) (emphasis added). Although this provision applies under circumstances that might implicate safety concerns, it does not regulate MPD's activity in a safety-specific manner; instead, the statute makes clear that its purpose is to prevent the unnecessary interruption of First Amendment activities. Because these provisions have no public safety purpose, they cannot form the basis for a claim of negligence *per se*. As a result, Count III must fail to the extent it is based on D.C. Code § 5-331.04(c) and D.C. Code § 5-331.07(c).

### E.   Count III and VI Should be Dismissed as Against Defendants Newsham, Greene, Alder, Carroll, Deville, Niepling, and Alioto for Lack of Personal Involvement.

Plaintiffs bring Counts III and VI against the District and all of the individual capacity defendants. But "public officials … cannot be held liable in tort for the acts of their subordinates under a *respondeat superior* theory unless they

directed or countenanced the tortious acts." *Turner v. D.C.*, 532 A.2d 662, 675 (D.C. 1987) (citation omitted).

Here, plaintiffs have not specifically alleged how the supervisory defendants violated the FAAA provisions upon which they rely. Instead, they allege in a conclusory manner that defendants Newsham, Greene, Alder, Carroll, Deville, Niepling, and Alioto generally "supervised, directed, or ordered" the conduct of MPD officers on inauguration day. *See, e.g.*, Compl. ¶¶ 8–9, 28, 58, 106; *see also* above. This constitutes the type of "unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, "that is not enough to state a plausible claim for relief against" these defendants "in [their] individual capacit[ies]," *Smith*, 149 F. Supp. 3d at 135. *See also King*, 640 A.2d at 666 (holding "as a matter of law only the employer, the District of Columbia, could be held liable for the tortious acts of one of its employees" (citations omitted)). For this reason, too, Counts III and VI should be dismissed as against these individual defendants.

## CONCLUSION

For the foregoing reasons, plaintiffs' Complaint should be dismissed with prejudice.

Dated:  March 30, 2018.          Respectfully submitted,

                                 KARL A. RACINE
                                 Attorney General for the District of Columbia

                                 TONI MICHELLE JACKSON
                                 Deputy Attorney General
                                 Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Chief, Equity Section

*/s/ Amanda J. Montee*
AMANDA J. MONTEE [1018326]
MATTHEW R. BLECHER [1012957]
ERIC U. JOHNSON [1030661]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-5691
(202) 741-8934 (fax)
amanda.montee@dc.gov

46